## The State v. Nocton, *Appellant.*

### Division Two, May 8, 1894.

1. **Criminal Practice**: EVIDENCE: DYING DECLARATIONS. It is for the trial court to determine as a preliminary question whether *ante mortem* statements of the deceased person are admissible as dying declarations on a trial for murder.

2. ———:· ———: ———. Such declarations may be admitted in evidence even without a formal statement of the declarant that he is without hope of recovery.

121  537
121  573
124  409
124  435
124  457

121  537'
133   54
134  138

121  537
137  135

121  537
145   25
148  240

121  537
156  189
156  211

3. ——: ——: ——. It is the impression of almost immediate dissolution and not the rapid succession of death in point of fact that renders a dying declaration admissible in evidence.

4. ——: MANSLAUGHTER: HARMLESS ERROR. Where a defendant has been convicted of murder in the second degree and the evidence sustains the verdict an instruction as to manslaughter in the third degree which is erroneous because there was no evidence of unintentional killing is harmless.

5. ——: .EVIDENCE: BRIBING WITNESS. On a trial of two defendants for murder it is competent to show that one of them who was indicted as an accomplice bribed witnesses to leave the state so as not to be present at his trial, where the court restricts the evidence to such defendant.

6. ——: ——: SELF-SERVING STATEMENTS. Defendant's self-serving statements made on surrendering himself are inadmissible where not a part of the *res gestæ*.

7. ——: ——. Evidence that one of the defendants stated that his codefendant was going to take a gun and kill the deceased if he crossed him or said anything to him was admissible as against the defendant making the statement.

8. ——: ——: THREATS. It was not error to exclude evidence as to what deceased said about defendant just before the shooting, where it was not shown that it was in the nature of a threat.

9. ——: ——: ERROR IN TRIAL COURT. One alleging error in the trial court must show it.

10. ——: ——. Where the brother of the deceased testified for the state that deceased never carried arms, it was not error to strike out the answer to the question, "He did not need to carry a revolver, did he?" asked on cross-examination, especially when it was shown that deceased was a powerful man and quarrelsome when drinking.

11. ——: COMPETENCY OF JUROR: AFFIDAVITS. If the fact that a juror was a "good friend" of deceased were ground for disturbing a verdict, affidavits which omit to show that defendant and his counsel did not know of such fact before the trial are fatally defective.

12. ——: PREJUDICE OF JUROR: AFFIDAVITS. Where there are conflicting affidavits as to the prejudice of a juror, the ruling of the trial court will not be disturbed unless clearly erroneous.

*Appeal from Jackson Criminal Court.*—HON. JOHN W. WOFFORD, Judge.

AFFIRMED.

Defendant was indicted for the crime of murder in the first degree, perpetrated by shooting with a revolver, Gerald Clune. Nora Jones, his paramour, was indicted as an accomplice in the crime. Though indicted and charged with murder in the first degree, the defendant Nocton, after being arraigned, with the assent of the prosecuting attorney, was permitted, with two sureties, to give bail in the sum of $1,000 for his appearance at the next term of the court. Defendant Jones was with the like assent also permitted to enter into personal recognizance of $1,000 for her appearance at the same time. Upon being tried Jones was acquitted, and Nocton, *alias* Leary was convicted of murder in the second degree; his punishment assessed at ten years' imprisonment in the penitentiary, and he appeals to this court.

On behalf of the state, the testimony shows that Nora Jones was a prostitute, with whom defendant James Nocton, *alias* Leary, was living in adultery. She also bestowed her favors on a single man, Gerald Clune, who lived about a block distant from Jones, with his mother. He was a young man some twenty-two years of age, of whom Nocton, *alias* Leary, was excessively jealous, and this jealousy produced frequent quarrels between Nocton and Nora, and he several times beat her because of Clune's clandestine attentions. Nora, however, persistently denied to defendant that there were any illicit relations between Clune and herself, but did not succeed in deceiving defendant, who from time to time made threats of killing Clune.

These threats were fulfilled on the twenty-fifth of August, 1892, at about 8 o'clock in the evening. The Jones woman occupied rooms upstairs, over a store, on a public business street; there were two entrances thereto—one flight of stairs leading up from the public street, in front, and the other leading up

from the rear toward the alley and ending directly opposite the front stairs, both stairways opening into a hallway, extending along the center of the building; at the foot of the rear stairs was a door, while the front stairway was open. All of the larger portion of the afternoon of the day mentioned, it appears from the evidence, defendant was watching the house where Jones lived. About 5 o'clock Clune called at the house—the woman then being absent; defendant followed him upstairs and, while incensed and angered, concealed his purpose and feelings, and acted friendly toward Clune, and the two drank some beer together. Clune left, but defendant still kept up his watch on the premises, returning several times and remarking that he believed she was away somewhere with Clune, and making ugly threats when he left. Jones returned home about 7 o'clock and she had no sooner entered when defendant followed her up, breaking forth into great abuse of her because of his suspicions as to Clune's visits and attentions. During the quarrel he struck her and knocked her down and then left. He went home and got the woman's picture from his trunk to return to her, and then went to the shop where he worked and got her revolver, in order, as he says, to return that to her also; it was only partly loaded, and he loaded the empty chambers and returned near to where Jones lived and continued his watch of the premises.

About 8 o'clock young Clune went up to the rooms occupied by Jones, she having sent his young brother after him. The testimony on behalf of the state shows in substance that Clune arrived at the invitation of Jones, but had scarcely done so, when defendant, who it seems had been watching, went to the back stairway door and rapped. When Jones inquired, who is that, Gallagher, a negro woman who worked for her, said to her, "Jim,

you know who it is." Thereupon Jones said to Clune, "Gerald, go down and open the door, I am afraid." Upon this request, in his shirt sleeves, and without any arms, Clune went down the back steps and opened the door, at which Jim Leary, *alias* Nocton, was standing, but Clune, as it seemed to a witness who stood in the hall only a few feet from the stairway, did not go out of the back door, nor did the witness hear any noise below nor any blows struck, though she thinks she was in a position to have heard them. When Clune reached there, defendant, "Jim," was heard to ask Clune, "Let me get my hat," and Clune said, "Get your hat; I am not bothering you or your hat." Just then four shots were fired in rapid succession, and Clune screamed out in agony at the first shot, when defendant said, "Squeal, you son of a bitch, I knew you would when you felt it."

Clune then staggered up the steps, coming backwards, as it appeared to the witness, and when he got to the top of the steps he fell, and asked witness to go for his mother and the priest. Some one came and asked who shot Clune and Jones instantly spoke up and said, "That nigger down there," whereupon Gallagher, a negro woman and witness, said, "No, it was not the nigger, it was Jim Leary." Jones denied making this statement, but the fact that Jones made it, was established by at least three witnesses. Immediately upon the shot being fired, smoke filled the hall so that it was impossible to see. There were three wounds on the body of the deceased, one on the right side about four inches from the backbone. The bullet which made this wound entered in the back on a level with the ninth rib; it cut that rib, went through the liver, entered the rib in front, passed through it and lodged in the vest pocket. The other wound was caused by a bullet which struck the right side of the back, went through and lodged in the left side, between two ribs and rather in

front and caused inflamation of the left lung; and the third wound was in the right shoulder blade, having entered, it seems, in front, a little above the interior of the arm pit.

Defendant, testifying in his own behalf, said: "I had been there that afternoon with Nora and had a fuss with her, *not about Clune*. I told her Clune was up there; she said he wasn't. I said I knew better. She called me a liar and went to cursing me and I slapped her. *I was not jealous of Clune;* I asked her where she had been; I said he was up there; she said no, she was arrested, and she said Clune was the cause of her being arrested shortly before that. It didn't make any difference to me if he was around there. *I can't say that I liked him to come and I can't say that I disliked for him to come.* * * * When I found the back door locked and heard a man coming down stairs and he got to the door I found it was Clune, I did not haul off and shoot him. I say I shot him in self-defense. He turned 'round; I didn't shoot him in the *back altogether.* I didn't see him have a weapon. I once saw him with a pistol; I don't think he was in the habit of carrying a pistol. I did not intend to kill him when I shot him. *I didn't know what he might have done to me if he got to kicking me.* * * * I did not say after I shot him, 'Squeal, you son of a bitch, I knew you would when you felt it.' To the best of my knowledge, he was seven or eight feet out in the area way—perhaps not that far; about six feet; area way opens right up to the sky. Nothing above to keep the smoke from going up. Shot him seven or eight feet from the door. The smoke went into the hall. I did not know this man was not armed. I did not see that he had no arms on him. He made no threat that he was going to kill me; *we were good friends.* Was three or four feet from him when I shot him. I did not stop shooting, because *I didn't*

*know but what he was coming toward me.* I was not shooting to kill; I shot to stop him. I fired other shots because I didn't know whether the one shot would stop him. He had been shot before. *I meant to be sure to stop him; I did not want to kill him.* I shot all the loads quick. I  kept shooting until he hallooed. I didn't know if the first and second shot stopped him. I kept on until he hallooed. I did not want to kill him. I wanted to keep him from hurting me, that is all. I did not know that when I fired the first shot he had turned to leave. I couldn't see him; the smoke was all in there.  *  *  *  I was down on my knee and foot when I shot. I believed he was going to kick me."

Defendant claimed to have a bruise on his face where Clune struck him, and Sherlock testified to an abrasion of the skin on defendant's face, as if he had fallen or been struck. William Crystle, a professional criminal, supported some of the statements of defendant as to the shooting and how it came about, etc. Jones also testified, supporting to some extent the testimony of defendant as to what occurred at the time Clune was shot; but she was not in sight of the parties, and not so close to them as was Gallagher, who was a disinterested witness. The state also showed that whatever marks were on defendant's face, were not caused by Clune, but by either scuffling with Jones or by running under a low shed in making his exit from the back yard, where the shooting occurred.

Clune, shot as before stated on the twenty-fifth of August, 1892, made what is termed "a dying statement" on the first of September next thereafter, and died on the second day of November of the same year.

As a basis for the introduction of a dying declaration made by Clune, the following testimony was introduced: It was shown that Dr. Griffin and some other doctors had told Clune, as he stated, that he could not

possibly get well. He said they told him he could not possibly recover. Asked if he expected to die, he said yes. He said he did not expect to get well. "When I asked him, he said 'How can I?' He said nothing as to when he was going to die; the question was not asked him. He was so weak we simply asked him the necessary questions. He expressed no hope at all. The only response he made as to whether or not he expected to get well, was in the negative, he did not expect to get well. He was very weak; indeed the statement that he made was made between gasps, in answer to questions asked him. He seemed so weak, he just told the story and as he told it the words were put down. This paper dated the first of September, 1892, contains most of the statement but not what is said about the doctor; it contains what he said at that time about the shooting of himself by the defendant taken down as Clune stated it. It is exactly what he said after he stated his condition."

"I, Gerald C. Clune, believing I am about to die make the following statement: I do not expect to get well. Jim Leary shot me. (Shot me over that Nora Jones woman, I guess.) I was standing at the back door. I started to go down stairs; he hallooed at me and told me to wait a minute. I had his hat; he said, fall, you son of a bitch, fall, and shot four times. I did not strike him. I shoved him, he was pretty full and fell over. He got up, looked around (as if he had lost something). (I thought he was going to pick up a rock.) I told him not to pick up any rock at me. He picked up a pistol from down among the cans and bricks and began shooting at me, he straightened himself first. I was standing on second step from bottom of stairs. He was about six feet away from me. I did nothing after I pushed him, he fell over against some wash boilers and got up and commenced looking for

the gun he had dropped.   (I didn't know he had a gun then, thought he was looking for a rock.)   I made no move towards him while he was looking for the rocks. I never put my foot out of the hallway after I shoved him.   I had no gun or anything in my hands.   I shoved him with my open hand.

"GERALD CLUNE."

"Subscribed and sworn to before me this first day of September, 1892.               M. H. JOYCE,
"Justice of the Peace."

The portions of the declaration in parentheses, were allowed to remain because counsel for defendant made no objection to those portions, but to the whole statement.   The court thereupon admitted the declaration in evidence.

Elston, who attended Clune from the time he was shot for some five or six weeks, testified:   "I saw him from one to three times a day and frequently staid in the neighborhood there all night when he was in imminent danger of dying."   Other facts will be adverted to as occasion may arise.

*A. S. Lyman* for appellant.

(1)   The court erred in permitting the police officers who were witnesses, viz.:   Lieut. Boulware, Captain Flahive and Policemen Ryan and Marksberry, to testify as to defendant's reputation for quarrelsomeness.   *First.*   Because the proper foundation had not been laid—the witnesses were not shown to be residents of the neighborhood where defendant lived, and, as such, acquainted with what his neighbors say of him.   *State v. Cox*, 67 Mo. 392;   *State v. Parker*, 96 Mo. 391;   *Waddingham v. Hulett*, 92 Mo. 533.   *Second.*   Impeaching

VOL. 121—35

evidence must be to his character for truth and veracity or to his general moral character. *State v. Grant*, 79 Mo. 133; *State v. Miller*, 93 Mo. 270; *State v. Rider*, 95 Mo. 486; *State v. Day*, 100 Mo. 242. (2) The so-called "dying declaration" of deceased was improperly admitted. The statement was made seven days after the shooting, on September 1, 1892, and deceased lived thereafter until November 2, 1892. That deceased said "that he could not get well and was going to die" is not sufficient. The statement must be made "in apprehension of immediate and pending dissolution." *State v. Simon*, 50 Mo. 370; *State v. McCanon*, 51 Mo. 160; *State v. Draper*, 65 Mo. 339; *State v. Kilgore*, 70 Mo. 546; *State v. Johnson*, 76 Mo. 124; *State v. Chambers*, 87 Mo. 406; *State v. Partlow*, 90 Mo. 608; *State v. Nelson*, 101 Mo. 468; *State v. Turlington*, 102 Mo. 656; *People v. Davis*, 56 N. Y. 95; *Scott v. People*, 63 Ill. 508; *People v. Knapp*, 26 Mich. 112. (3) The question put to James Clune, the brother of deceased, was material and proper and should have been allowed. (4) The question put to the colored woman, Lizzie Gallagher, as to whether she remembered how she testified before the justice was material and should have allowed. *State v. Reed*, 89 Mo. 168; *Peck v. Ritchey*, 66 Mo. 114. (5) The questions asked of the witness Lizzie Gallagher as to efforts on the part of Nora Jones to get her to leave the state and the reasons why she wanted the witness to go away were highly improper, and should not have been allowed. (6) Defendant's objection to the question asked by the state of the witness Lizzie Gallagher as to conversations with defendant's brother should have been sustained. The court instructed the jury to disregard this evidence, but it was error to admit it and the giving of the instruction did not cure that error. *State v. Kirchner*, 93 Mo. 193; *State v. Jaeger*, 66 Mo. 174. (7) The jailor, Sherlock,

·should have been permitted to state what injuries he ·observed on defendant's person and what defendant .stated to him immediately after the shooting, when defendant came into the station, gave up the pistol, and surrendered himself to the police. *Ganter v. State*, 21 :S. W. Rep. (Tex. Crim. App.) 255. (8) The state :ment made by Clune just as he started to go down to ·open the door for defendant was material and should . have been allowed. If it was a threat, as we contend ·it was, then it was admissible to show who was the .aggressor, in view of the plea of self-defense. *State v. Elkins*, 101 Mo. 334. It was material and competent .as part of the *res gestæ. Ibid.* (9) Defendant's motion for a new trial ought to have been sustained.

*R. F. Walker*, Attorney General, and *Marcy K. Brown*, Prosecuting Attorney, for the state.

(1) The indictment is drawn under section 3459, Revised Statutes, 1889. (2) The first six instructions given for the state are in form repeatedly approved by this court. "Heat of passion" as defined in instruction number 6 is literally taken from *State v. Jones*, 78 Mo. 281. Instruction number 8, upon murder in the first degree, is in the approved form. *State v. Smith*, 114 Mo. 415. Instruction number 9, upon murder in the second degree, has been repeatedly approved. *State v. Stephens*, 96 Mo. 646; *State v. Elliott*, 98 Mo. 158; *State v. McKenzie*, 102 Mo. 630. Instruction number 10, upon manslaughter in the third degree, is in language repeatedly approved. *State v. Peake*, 85 Mo. 192; *State v. Thomas*, 78 Mo. 338; *State v. Woods*, 97 Mo. 34; *State v. Talmage*, 102 Mo. 543. Instruction number 11, upon manslaughter in the fourth degree, is in the approved form. *State v. Vansant*, 80 Mo. 68; *State v. Ellis*, 74 Mo. 215; *State v.*

*Hicks*, 92 Mo. 439; *State v. Gee*, 85 Mo. 649. Instruction number 12, upon the intentional use of a deadly weapon, was properly given and is in proper form. *State v. Tabor*, 95 Mo. 591; *State v. Talbott*, 73 Mo. 347. Instruction number 13, upon self-defense, was the counterpart of the one given for defendant, and was correctly given from the state's standpoint, and has been repeatedly approved. *State v. Rider*, 95 Mo. 482. Instruction number 14 was most favorable to defendant; as to the evidence concerning certain efforts of defendant's brother to induce one of the state's witnesses to absent herself at the time the evidence was introduced, no objection was made by defendant, and not until it was all in; hence no error was committed by its admission; yet the court then, at the time, stated that the evidence was incompetent and that the court would instruct the jury to disregard it, which was properly done in this instruction. *State v. Blan*, 69 Mo. 324; *State v. Hopper*, 71 Mo. 429. (3) The last instruction given by the court upon its own motion, in behalf of defendant, fully covered defendant's theory of self-defense, and is taken literally from *State v. Gee*, 85 Mo. 650; *State v. Parker*, 106 Mo. 224; *State v. Berkley*, 109 Mo. 676. (4) "Where a competent question is at first excluded, but upon further examination the defendant receives the full benefit of the excluded question, he has no cause for complaint." *State v. Sansone*, 22 S. W. Rep. (Mo.) 617. (5) The deceased, Gerald Clune, was certainly *in extremis* when his dying statement was taken, and knew it, and believed he was about to die. He had received necessarily fatal wounds, having been shot through the liver, and blood poisoning having already set in from this and other wounds. Under all the decisions the dying declaration was without question admissible. *State v. Wensell*, 98 Mo. 139; *State v. Elkins*, 101 Mo. 350;

*State v. Chambers*, 87 Mo. 408; *State v. Nelson*, 101 Mo. 468; *State v. Kilgore*, 70 Mo. 551. The length of time which elapses between the declarations and the death does not affect the admissibility of the declarations. *State v. Wensell*, 98 Mo. *loc. cit.* 146; *State v. Kilgore*, 70 Mo. *loc. cit.* 553, and cases cited.

SHERWOOD, J.—I. The first point for examination is the admissibility of the dying declarations already set forth. At first the trial court refused to admit them; but subsequently decided them to be competent. It belonged to that court to determine, as a preliminary question, whether such declarations were admissible. Wharton's Crim. Ev. [9 Ed.], sec. 297; *State v. Simon*, 50 Mo. 370. It is unnecessary to enter into the subject of dying declarations seeing that that subject has so recently been fully discussed by us in *State v. Johnson*, 118 Mo. 491. The general rules applicable to the subject are there laid down and the authorities cited which support them.

The circumstances of this case show that Clune was fully impressed that his dissolution was close at hand. He had every reason to believe it, both from what he was frequently told by his medical advisers, and by the terrible pains to which he had been subjected for a week before the declaration was made, and that statement when made *"was made between gasps."* This testimony when considered in connection with that portion of Dr. Elston's testimony already quoted, shows very conspicuously the admissibility of the declarations in question. The declaration, as shown by his direct statements as well as his answers to questions that he was without any hope of recovery and his reasons therefor, proceeds, after stating his name, to say that he believes he is *"about to die."* This, with what had

gone before, was certainly sufficient as an indication of the impression made on Clune's mind.

A declaration may be received in evidence even without such a formal statement. Thus, though "It is essential to the admissibility of these declarations, and is a preliminary fact to be proved by the party offering them in evidence, that they were made under a sense of impending death; but it is not necessary that they should be stated, at the time, to be so made. It is enough, if it satisfactorily appears, in any mode, that they were made under that sanction; whether it be directly proved by the express language of the declarant, or be inferred from his evident danger, or the opinions of the medical or other attendants, stated to him, or from his conduct, or other circumstances of the case, all of which are resorted to, in order to ascertain the state of the declarant's mind. The length of time which elapsed between the declaration and the death of the declarant furnishes no rule for the admission or rejection of the evidence; though, in the absence of better testimony, it may serve as one of the exponents of the deceased's belief, that his dissolution was, or was not, impending. It is the impression of almost immediate dissolution, and not the rapid succession of death, in point of fact, that renders the testimony admissible." 1 Greenleaf on Ev. [14 Ed.], sec. 158; 3 Russell on Crimes [9 Am. Ed.], *250; 6 Am. and Eng. Encyclopedia of Law, p. 108, et seq., and cases cited. On these grounds, we rule this point in favor of the state.

II. As to the instructions, no complaint is made of them, they are in the usual stereotyped form, embracing murder in the first and second degrees, manslaughter in the third and fourth degrees and an instruction relating to self-defense.

In this connection, however, it is well enough to

remark that under the more recent rulings of this court, defendant's statement that he did not "*intend to kill*" Clune when shooting directly at him and hitting him three times when only six feet away, it not to be believed in the face of the incontrovertible physical facts thus disclosed by the evidence. *State v. Nelson,* 118 Mo. 124. And if defendant shot at Clune with intent to kill him, and as he had a right to do in his proper self-defense, then he certainly could not have been guilty of an *unintentional* killing, to wit, manslaughter in the third degree. *State v. Pettit,* 119 Mo. 410.

But, inasmuch as defendant was convicted of murder in the second degree, no injury accrued to him in this regard, because by their verdict the jury have said that defendant intentionally killed Clune, and not in his necessary self-defense, and, therefore, he is *prima, facie* guilty of murder in the second degree. *State v. Tabor,* 95 Mo. *loc. cit.* 595, and cases cited.

And under the ruling in *State v. Gilmore,* 95 Mo. 554 and *State v. Bryant,* 102 Mo. 24, the facts disclosed in evidence of defendant's firing on his maimed and retreating adversary, shooting him in the back and side, show very clearly, and despite all of his denials to the contrary, that it was not self-defense, but a fierce spirit of jealously and revenge that caused defendant to use his pistol as charged in the indictment.

III. Several objections were made by defendant to the introduction of evidence on the part of the state and also to the rejection of evidence offered on behalf of the defense.

*a.* It was entirely competent to introduce evidence to show that Jones attempted to bribe witnesses to leave the state so as not to be present at the trial of defendant Jones, and to this point the court by its instructions restricted it, and this was all that was necessary.

*b.* The testimony of Sherlock was admitted as to an abrasion being on the face of defendant as if he had been struck a blow or had fallen; but certainly defendant's self-serving statements when he came into the police station to surrender himself after perpetrating the murder, could not be received, and it was not, as is claimed, part of the *res gestæ.*

*c.* Jones was on trial as an accomplice of the defendant in the murder of Clune. For this reason her statement to Minnie Snyder that defendant was going to take a gun and kill Clune if he crossed him or said anything to him, was competent evidence as showing that Jones was conversant with defendant's plans, intentions and threats towards Clune, and the ruling of the court limited the evidence of Snyder to Jones alone and excluded it as to defendant. This ruling was entirely correct.

*d.* The point is made that the court below erred in excluding an answer to the question to Jones as to what Clune said about defendant when he started down the back stairway to open the door for him. What Clune *said* about defendant was sheer hearsay. If Clune at that time uttered a *threat*, this ought to have been brought to the attention of the court, and then if evidence of the threat were excluded, the point should have been saved. As the matter now stands, we are called upon to say that the court erred in excluding a *threat*, when it is impossible to say whether the court did so or not. We do not propose to use a mere *conjecture* as a basis on which to convict a trial court of error. He who alleges error must prove it. *Bank v. Aull,* 80 Mo. 199; *Kruxberger v. Roiter,* 91 Mo. 404; *State ex rel. v. Leland,* 82 Mo. 260; *Jackson v. Hardin,* 83 Mo. 176.

*e.* It is claimed error occurred in permitting certain policemen to testify as to defendant's reputa-

tion for quarrelsomeness, but no objection was made to this testimony nor exception saved, and, therefore, can not be considered. It is singular that counsel would urge such pointless points as these.

*f.* James Clune, in testifying, stated that his brother never carried arms, and thereupon defendant's counsel asked witness: "He did not need to carry a revolver did he?" The answer to this question was properly stricken out. It would have been the mere opinion of the witness. Besides, it was subsequently established that Clune was a powerfully built man, and when drinking quarrelsome and turbulent, and from these facts the jury could draw their own inferences.

*g.* Other errors are claimed to have occurred in the admission or exclusion of evidence, but they are either too trivial to merit attention or else were cured by evidence subsequently admitted.

IV. Affidavits were filed on behalf of defendant to show that Wm. Foster was a good friend of Clune the deceased, etc., etc., in order to show that Foster should not have sat on the jury that tried defendant. These affidavits were met by counter affidavits of Foster and others and upon them the court passed, and this ruling being one of *fact*, it would require a very strong case indeed in order to induce us to reverse, in this regard, the action of the trial court. *State v. Howard*, 118 Mo. 127. But by saying this, we are not to be understood as ruling that a "good friend" of one who has been murdered, may not be a perfectly competent juror to try his assassin.

Moreover, even if friendship for a murdered man renders a person incompetent to sit as a juror in the case of his murderer, there is a fatal objection to the affidavits in this instance, arising from the fact that it does not appear but what both defendant and his counsel were conversant with the fact that Foster and

Clune were "good friends." *State v. Burns*, 85 Mo. 47; *State v. Howard, supra.* No intendments are made in favor of affidavits of this sort, nor are they favored by the courts.

Having carefully examined the record and finding no material error therein, we affirm the judgment. All concur.