THE STATE v. EVANS, *Appellant.*

Division Two, November 5, 1894.

1. **Criminal Practice** : EVIDENCE: DYING DECLARATIONS.  Where, on a trial for murder, it is shown that the deceased stated he was "shot to death," his statements made at the time are admissible as dying declarations though he also asked that a physician be sent for, as such wish, under the circumstances, shows merely a desire to be relieved from pain.

2. ———: ———: ———.  Though the declarations of deceased were inadmissible at their first utterance, yet, if, having subsequently become conscious that he was dying, he reaffirmed them, they were then admissible as dying declarations.

3. ———: ———: ———.  That the declarations were made under a sense of impending death may be shown by the conduct of the deceased and the surrounding circumstances.

4. ———: ———: ———.  A statement by deceased made just before his death that he "forgave" defendant who had shot him, is inadmissible.

5. **Criminal Law**: THREATENED ATTACK: SELF-DEFENSE.  The mere fact that defendant, in expectation of an attack, armed himself and knowingly went where the deceased was and where the defendant had the right to go did not deprive him of the right to take life in self-defense.

6. **Criminal Practice**: MURDER IN SECOND DEGREE: PRESUMPTION: INSTRUCTION.  An instruction that, if the jury find that defendant intentionally killed deceased with a loaded pistol, the law presumes that such killing was murder in the second degree in the absence of

proof to the contrary, and that it devolves on the defendant to adduce evidence to meet or repel that presumption, unless it is met or repelled by evidence introduced by the state, is proper. *(State v. McKinzie,* 102 Mo. 620, *overruled).*

7. ———: REMARKS OF PROSECUTING ATTORNEY. On a trial for murder the prosecuting attorney should not (in the absence of an instruction to that effect) state in his argument to the jury that "it was the duty of the defendant to prove that deceased had a pistol."

8. ———: IMPROPER REMARKS OF COUNSEL, REMEDY FOR. Where counsel overstep the bounds of legitimate argument the proper and only course for opposing counsel to pursue is to call the court's attention to the matter and, if necessary, have an instruction thereon.

*Appeal from Cooper Circuit Court.*—HON. D. W. SHACKLEFORD, Judge.

REVERSED AND REMANDED.

*Draffen & Williams* and *John Cosgrove* for appellant.

(1) The statements of deceased and his wife were not competent as dying declarations. *State v. Simon,* 50 Mo. 370; *State v. Johnson,* 118 Mo. 491; *Matherly v. Com.,* 19 S. W. Rep. 977. (2) The defendant ought to have been permitted to prove that a few days before the shooting he had caused the deceased to be arrested for the purpose of binding him to keep the peace toward defendant. The latter had appealed to the law for protection and deceased uttered, bitter threats because he had done so. (3) The courts fifth instruction should not have been given. *State v. McKinzie,* 102 Mo. 620. (4) The court erred in giving the eighth instruction. The mere fact that defendant expected deceased to assault him, when he went to the place where the deceased was, and that he armed himself in expectation thereof, would not deprive him of the right to defend himself against an assault, if made. The instruction does not contain the necessary qualifications. *State v.*

*Partlow*, 90 Mo. 608; *State v. Lewis*, 118 Mo. 79; *State v. Rider*, 90 Mo. 55; *Cartwright v. State*, 14 Texas, App. 486; Kerr on Homicide p. 202. The court erred in failing to instruct as to manslaughter. The evidence justified such an instruction. This point was made in the motion for new trial. *State v. Palmer*, 88 Mo. 568. (5) The first paragraph of the ninth instruction given by the court is erroneous. It limits the threats made by the deceased, whether communicated to defendant or not, to the sole question of who made the first assault. (6) Instructions numbers 1 and 2 asked by defendant and refused by the court should have been given. *State v. Jones*, 78 Mo. 278; *State v. Hicks*, 92 Mo. 431. (7) The court erred in refusing instruction number 3 asked by the defendant. The testimony of defendant justified it; and he was entitled to have an instruction based upon his own testimony given to the jury. *State v. Partlow*, 90 Mo. 626. (8) The prosecution proved that the defendant armed himself. His conduct in procuring a pistol after deceased had repeatedly threatened him, was made a prominent feature of the case throughout the trial. Defendant was cross-examined about it quite lengthily by counsel for the state. The court should have instructed that under the circumstances existing before the killing, defendant had a right to arm himself. *State v. Harrod*, 102 Mo. 590; 2 R. S. 1889, sec. 3503. (9) The sixth instruction prayed by defendant, and refused by the court should have been given. *Kemp v. State*, 13 Tex. App. 561–565. (10) It was error for the court to refuse instruction 6 prayed by defendant. There was evidence upon which to base it and the same should have been given. (11) The remarks of the attorney of the state in the closing speech to the jury, that "it devolved upon the defendant to prove that the deceased had a pistol," were improper. The remarks were

objected to at the time by defendant's counsel, but the court, in the presence of the jury overruled the objection.

*R. F. Walker*, Attorney General, and *Morton Jourdan*, Assistant Attorney General, for the state.

(1) The prerequisites for the admission of the dying declarations existed beyond any question, that is, the fact that the deceased was at the point of death, and that he entertained a well-founded belief and conviction of immediate or impending dissolution; that he was about to die and could at best only live a few moments. The declarations were, therefore, admissible. *State v. Wilson*, 26 S. W. Rep. 357; *State v. Nocton*, 121 Mo. 537; *State v. Johnson*, 118 Mo. 491; *State v. Welsor*, 117 Mo. 570; *State v. Umble*, 115 Mo. 452; *State v. Elkins*, 101 Mo. 350; *State v. Nelson*, 101 Mo. 468; *State v. Stephens*, 96 Mo. 638; *State v. Wensell*, 98 Mo. 139; *State v. Rider*, 90 Mo. 54; *State v. Mathes*, 90 Mo. 571; *State v. Chambers*, 87 Mo. 408. (2) The court committed no error in the matter of the instructions. (3) Nor did the court commit error in permitting the state's counsel to say to the jury that the defense had failed to establish that the deceased had a pistol and that it was the duty of the defendant to prove that fact. *State v. Jackson*, 95 Mo. 623; *State v. Anderson*, 89 Mo. 312; *State v. Young*, 105 Mo. 634. (4) The weight of the evidence was a matter for the consideration of the jury as the triers of the fact. *State v. Young* (Mo.), 24 S. W. Rep. 1038; *State v. Richardson*, 117 Mo. 586; *State v. Herrman*, 117 Mo. 629; *State v. Banks*, 118 Mo. 117; *State v. Moxley*, 115 Mo. 644; *State v. Burd*, 115 Mo. 405; *State v. Jackson*, 106 Mo. 181; *State v. Orrick*, 106 Mo. 111; *State v. Howell*, 100 Mo. 628; *State v. Lowe*, 93 Mo. 547; *State v. Hicks*, 92 Mo. 432.

SHERWOOD, J.—This appeal questions the correctness of certain rulings made by the lower court during the trial of Riley Evans on a charge of murder in the first degree, which trial resulted in his conviction of the second degree of that crime and the assessment of his punishment at imprisonment in the penitentiary for the term of twenty-five years.

On the trial it was developed by the evidence that Peter Fine, the deceased, rented a farm owned by defendant's wife; both defendant and deceased and their families living on the farm and occupying portions of the same dwelling house. The term of Fine had about expired, and he had been informed by defendant that he wanted possession of the farm on the expiration of the year for which it was rented to him. This announcement displeased Fine and gave rise to altercations between the parties and threats on the part of Fine towards defendant, so much so, that several days before the homicide occurred, defendant felt it to be necessary to take steps and secure the arrest of Fine in order to have him bound over to keep the peace. His arrest greatly enraged Fine, and he made threats of taking defendant's life unless he got off the place, etc.; these threats, some of them, extending even down to the morning of the day on which Fine was shot, the twenty-fifth of October. On the morning of that day having been freshly threatened, defendant for his own protection, deemed it necessary to procure a pistol, which he did by riding to Boonville for that purpose, and having loaded the weapon, returned home with it in his pocket, reaching there about noon. After putting his horse up in the stable he went to his house, and after some talk with his wife about domestic affairs, went down for some corn into the cornfield where the tragedy which forms the subject of the present prosecution, occurred.

Adeline Fine, sister of Peter Fine, stated that, hearing a niece of hers, Mary Fine, halloo, "Evans has shot papa," she went out of the house down into the cornfield, and there found her brother lying down in a drawn-up position by a fence some fifty yards from the house, she being the first one to arrive on the ground. She relates the conversation that occurred between herself and brother in this way: "I said, 'how is this?' and he says 'I am shot to death;' and I said 'you and Evans had a fuss?' and he says 'no, we have had no fuss;' and I said to him 'had we better have a doctor?' and he said 'send for Dr. Cockran.'" Being asked what else her brother said in reference to the shooting, she said: "Well, he just said he was shot to death and that 'I can't live' and that there was no trouble at all. I asked him if there was any fuss and he said nothing but kind words; he said Evans came up to him and they spoke something about the weather." She further stated that the shooting happened about 1 o'clock, and that her brother lived after being shot about one hour; that just before the shooting, some fifteen or twenty minutes, she saw defendant pass the door and go to the well and get a bucket of water and return to the house; that the wife of deceased reached the fatal spot a few minutes after she did, and witness Broyles shortly after that; that they placed her brother on some quilts, and he died in the field where he lay when found.

Mrs. Fine, the widow of deceased, testified in substance that so soon as her daughter hallooed, as before stated, she started to go to her husband. When she reached him, which she did after her sister-in-law did, when being asked to state what her husband told her in reference to the shooting, she replied: "I said to him, 'Mr. Fine, tell me all about it.' He says, 'there is nothing to tell; nothing but kind words spoken; he spoke about the weather; I turned and he shot me; I

hallooed for you, and you didn't hear, and I started to
the house, and that is all there is to tell.' ''   She further
stated that her husband lived some three-quarters of an
hour after this conversation, and that he died there on
the ground.

Broyles, who lived not quite a half mile from the
scene of the killing, testified in substance that he arrived
at the locality some fifteen or twenty minutes after the
shooting, saw Fine lying down on the ground on some
quilts which had been prepared for him, where he died;
that he made no statement about the shooting after he
arrived; that some one else asked Fine where the shoot-
ing took place, when the latter, being feeble and just
able to speak, pointed down in the field west of where
he was lying.   This witness then speaks of going down
into the field with others, and seeing tracks pointed
towards a sack where Fine, it seems, had been gather-
ing corn at the time of being shot, there were a few
ears of corn in the sacks, and there was the mark of a
bullet on a cornstalk.

Street  testified: that he was constable of Saline
township, Cooper county; that he saw defendant at B.
F. Bedwell's, October 25, 1893; defendant told him he
had shot Mr. Fine and that he was witness' prisoner;
that he started to Boonville with defendant as soon as
the magistrate made out the commitment; that on the
way to Boonville defendant said that he was afraid of
deceased; that he had nothing at home to protect him-
self, and went to Boonville and got a pistol; that when
he reached home dinner was not ready, and he went to
the barn to get some chicken feed, and saw deceased
in the cornfield gathering corn, and went to see if he
was dividing it right, and spoke to deceased and said,
"It is a fine day but a little cloudy," and deceased
turned around and said, "What are you doing here,
you s— of a b—?" and defendant said, "I could not

stand that I and went to shooting;" that he asked de-
fendant if deceased started at him and he said, "No,
but he turned around and looked at me like a lion."
That was about all he told witness and was exactly
what he told him. Further he stated that defendant
told him that he was afraid Fine would kill him; that
he had threatened him repeatedly, and told him about
trouble they had in the road; that he met Fine in the
road, and Fine ran him through a wire fence; that
Fine road his horse in front of him in the road and
would not allow him to pass; that deceased was on
horseback and that he was on foot, and he was obliged
to run through a barbed wire fence and go home through
a corn field to get away from Fine, who told him if he
swore certain things against him he would kill defend-
ant; and that he killed Fine because of the threats
before mentioned.

Dr. Cockran, introduced as a witness, testified that
there were gun shot wounds in Fine's body and limbs,
one through the center of his arm and one above the
left nipple, both caused by the same bullet, another
wound was made by a bullet, which entered between
his ninth and tenth ribs, about midway of his back,
some two and one half inches from the spinal column,
ranging through him and lodging under the shoulder
blade; which wound have caused his death, etc.

Arn, a gunsmith, testified to having sold defend-
ant a pistol on the morning of the homicide. This
closed the testimony on the part of the state.

Testifying in his own behalf, defendant stated:
That his wife owned the farm on which he and Fine
were living; that he and his family occupied a part of
the house, and Fine and his family occupied the other
part; that a few days before the shooting he and
deceased met at the stable on the place, and deceased
asked him if he was going to the rally, and acted as if

he was in a good humor, but he saw that he was not. He told deceased that he was not going, and deceased then spoke to him very short and said, "I will give you to day to get off this place." He said: "You have served the warrant on me, and I am not going to let you live until the trial comes off; and I will give you to understand that you must leave this place to day." This was at the stable the morning of the shooting.

When I went to feed my mare and mules, I met him about half way, coming to the house, and he had his knife open, pretending to gouge his finger nails; he pointed the knife at me and said: "I will give you a day to leave this place.' He said: 'I mean it. You can go away or I will kill you, if it is the last act of my life.' He said: 'You had me arrested, and if the trial goes against me, I will kill you if it is the last act of my life.' This was in the morning, and the shooting took place in the afternoon. Prior to that he made threats all along. I met him in the road one day —I was walking and coming up facing him. I was going to Gooch's mill, and he rode up to me and said: 'You are going to the Lick,' and he said: 'Stop,' and I went up to go ahead, and he turned his horse in front of me, and I went up the slough bank, and he shoved me back on the wire fence, and his horse stepped on my foot, and he said: 'I have got you by yourself' and I am going to fix you,' and pulled a revolver out of his pocket and said, 'I am going to fix you; and just then Mr. Simms come along in a wagon, and I got loose and went home through the field and waded the creek. I hallooed back at him when I first got through the fence, and he said: 'If you aren't careful I will kill you before the sun goes down,' and as I ran through the field, I said, 'I will have you arrested to keep the peace,' and he said, 'Arrest and

be damned.' This was Friday before the shooting, on Wednesday. The same morning that he met me in the road, my wife and I were eating breakfast; I had a sow in a pen, and deceased came up in front of the door with a green hickory club in one hand and a chicken in the other. He said he got the chicken out of the pen, and said my sow had killed it. He shoved the door open with the club and said, 'You can take your sow and get off the place, or I will fix you, and I mean it, too.'"

Witness described his trip to Boonville, where he bought a pistol, and back home, and continued: "After I got home, I put my mare in the barn and fed her, and went to the house, and my wife said dinner was not quite ready, and I said, 'I will feed the chickens,' and picked up the bucket, and she said 'Go and get some corn,' and I said, 'I will go down to the field and fetch some corn for the sow.' I had no hat on my head. Before this, and when I rode up on my horse, Mr. Fine was there, close to the stable and he said, 'Come here.' I did not answer. I went on and put my mare up and fed her. I took a tin bucket with me when I went to get chicken feed. I got the chicken feed at the barn and then went to get some corn for the sow. I walked towards Fine; he was standing this way (partly sideways). I said, 'A nice day,' and he said, 'Yes,'' and turned (indicating) and said, 'You son of a B——, I will fix you,' and jumped at me that way (indicating); slapped his hand on his right hand pocket, and said, 'You son of a b——, I'll fix you;' and I shot him to keep him from killing me, I shot, and ran as I shot. I jumped behind him, for I knew he would shoot me if I did not; I shot as I ran; I shot five times altogether; I kept shooting as I ran; I then went to Esquire Bedwell's. It was about one mile."

Sims and Hoxel, witnesses for defendant, cor-

roborated his story to Street, upon the stand as a witness, how Fine had stopped defendant in the road, and finally ran him through a barbed wire fence, so that he had to go round through a corn field in order to get away from Fine and reach home.

Dr. Winterbower, who, as administrator, had rented the farm to Fine, testified about Fine's violent and murderous threats made to him about defendant, and that he had warned defendant about them and told him to be on his guard. These threats were made on the eighteenth of October, just one week prior to the himicide.

The justice of the peace, who issued the commitment for defendant, also testified as to similar threats made by Fine against defendant, on Friday, the twentieth of October.

Tucker, another witness for the defense, testified that a few days before the shooting, and just after Fine had come home ofter giving sureties of the peace, he told witness he had told his sister to tell Riley Evans that "the lion was loose," and that defendant had better scamper off to the sinkholes of the Moniteau.

The state in rebuttal, showed by Mrs. Fine that her husband never owned a pistol in his life, and that she never saw him with one in her life.

The foregoing contains the substance of what was testified before the *jury*.

1. We now proceed to examine such of the errors assigned as are thought material.

*a.* And first, as to the admissibility of the dying declarations. The resume of the testimony touching those declarations already set forth, shows, however, that there was *no testimony whatever*, produced before *the jury*, showing, except by intimation and *inference, who it was that shot Fine*. But, notwithstanding this serious defect, inasmuch as the testimony introduced as to such

declarations, in the preliminary hearing before the court has been preserved in the bill of exceptions, and is full on the point mentioned, and inasmuch as the judgment must be reversed for reasons presently given, we have deemed it best to discuss the admissibility of those declarations just as they appear on the record of the preliminary hearing.

It is objected by counsel for defendant that such declarations were inadmissible because Fine's desire to send for a physician, indicates that hope, although he stated he was "shot to death." The case of *Matherly v. Commonwealth*, 19 S. W. Rep. (Ky.) 977, is cited in behalf of and supports this view.

But very often a desire to be freed from intense pain, will prompt the sending for medical aid though all hope of life be abandoned. Indeed, numerous instances are recorded where those agonizing under the tortures of grievous wounds, have besought their friends to take their lives in order to rid them of the unbearable pain. So that it will at once be seen that the mere fact that the victim of some lethal weapon who lies writhing under the torments of some murderous blow, seeks temporary relief from his intolerable anguish, should be received as not indicating a hope of life, but as a natural prompting to be relieved from pain. This is the view taken of this point elsewhere, when the victim of a fatal wound said, "I am shot; I am dying" and at the same time "wished for a doctor to be sent for," and upon a case reviewed, it was held *per tot. cur.* that the declarations were admissible, DENMAN, C. J., delivering the terse opinion. *Regina v. Howell*, 1 Den. C. C. 1. That case we regard as announcing the better rule. To the like effect see *McQueen v. State*, 15 S. W. Rep. (Ala.), 824.

In the present instance, however, it will be noticed that Fine expressed a wish for a physician *after* an

interrogatory suggestion from his sister. But in the light we regard the matter, it is wholly immaterial who made the first suggestion of that sort.

*b.* Again, the declarations were admissible for another reason regardless of the one already given, because the evidence introduced in the absence of the jury, shows that after a physician had been sent for, Fine reiterated to Broyles his former statement, *"I am shot to death."* Where prior declarations are inadmissible at their first utterance, they may become admissible when subsequently the declarant becomes conscious that he is dying and reaffirms his former statements. *Regina v. Steele,* 12 Cox C. C. 168; Wharton's Crim. Evi. [9 Ed.], sec. 287; Wharton on Homicide [2 Ed.], sec. 756.

*c.* Furthermore, while it is one of the essentials to the admissibility of such declarations that they be *"made under a sense of impending death,"* yet such explanatory statement need not be made along with the declaration. It suffices if, in any mode, such sanction clearly appears, whether from express language or obvious danger of the declarant, or from the disclosed opinions of his medical or other attendants, or even from his conduct or the surrounding circumstances, which discover that such sanction is plainly operating on the declarant's mind. 1 Greenleaf on Ev. [14 Ed.], sec. 158; *State v. Nocton,* 121 Mo. 537.

In the case before us, every attending circumstance —two painful wounds in his body, one confessedly mortal, another in his arm; his inability to traverse the short distance of some sixty yards to his house; his falling helpless in the attempt; and his deathly sickness, all went to impress on the mind of the declarant with powerful premonition that for him, soon the "silver cord would be loosed and the golden bowl be broken."

*d.* While evidence was being received respecting

the dying declarations, Mrs. Fine was allowed, over the objection of the defendant's counsel to depose that her husband said, just before dying, that he forgave defendant for shooting- him.   Such statement formed no part of the declaration; and was a mere narative of a past occurrence; had no tendency to illustrate anything connected with the commission of the crime, and was, therefore, wholly inadmissible.   Every such remark and incident should be seduously excluded.

2.   Speaking of the instructions generally, and taking them as a whole, they are such as have frequntly received the approval of this court.   Express objection has, however, been taken to the eighth instruction couched in this language:

"If you find from the evidence that the defendant armed himself with a deadly weapon and went to where the deceased was, *expecting* the deceased to assault him, and with the intent of inflicting death or great personal injury upon the deceased, then he can not be justified upon the ground of self-defense, even though you should find that the deceased was about to kill him or inflict upon him some great personal injury.   But the fact that he went to the field where the deceased was would not deprive him of the right of self-defense if he went with some other purpose and not with the expectation that a difficulty would arise and with the intent of inflicting death or a great personal injury upon the deceased."

The fact that defendant *expected* an attack did not abate by one jot or tittle his right to arm himself in his own proper defense, nor to go where he would, after thus arming himself, so long as he did no overt act or made no hostile demonstrations toward Fine.   Defendant was where he had a right to be, the land belonged to his wife; he had a right to see that proper division was made of the crop, and to oversee such division. *State v. Forsythe*, 89 Mo. 667.

If the mere *expectation* of an assault from an adversary is to deprive the expectant of the right of self-defense, merely because he goes armed in the vicinity of his enemy, or goes out prepared upon the highway where he is likely at any moment to meet him, then he has armed himself in vain, and *self-defense* ceases wherever *expectation* begins.

We do not so understand the law. The very object of arming one's self is not to destroy *expectation* of a threatened attack, but to be prepared for it should it unfortunately come. Our legislature has sanctioned this view by making the carrying of concealed weapons non-punishable, when the accused has been threatened with great bodily harm, etc. R. S. 1889, sec. 3503. The instruction must, therefore, be ruled erroneous.

3. The fifth instruction is the following:

"If you find from the evidence that the defendant intentionally killed Peter Fine by shooting him with a loaded pistol and that such pistol was a deadly weapon, then the law presumes that such killing was murder in the second degree, in the absence of proof to the contrary; and it devolves upon the defendant to adduce evidence to meet or repel that presumption, unless it is met or repelled by the evidence introduced by the state."

Similar instructions to this one have long received the sanction of this court. *State v. Hays*, 23 Mo. 287; *State v. Holme*, 54 Mo. 133; *State v. Underwood*, 57 Mo. 40; *State v. Grant*, 76 Mo. 236; *State v. Anderson*, 89 Mo. 312; *State v. Tabor*, 95 Mo. 585.

This was the rule at common law. 3 Greenleaf on Evidence [14 Ed.], sec. 144; *Rex v. Greenacre*, 8 C. & P. 35.

We have been cited to a ruling *contra* this, *State v. McKinzie*, 102 Mo. 620, but we disapprove of that ruling.

4.   The language of the prosecuting attorney was not the law when asserting that "it was the duty of the defendant to prove that deceased had a pistol." This was not the law, and if it had been, the fountain of the law for the purpose of the trial, is the *court*. If opposing counsel overstepped the boundary of legitimate argument, the proper course to pursue and the only course to pursue was to call the attention of the court to the matter, and if necessary have an instruction on the point. The objection of defendant's counsel to this remark was well taken.

For the errors aforesaid, the judgment is reversed and the cause remanded.   All concur.