[Crim. No. 94.   Filed May 31, 1897.]

[51 Pac. 145.]

CHARLES C. WAGONER, Defendant and Appellant, v. THE TERRITORY OF ARIZONA, Plaintiff and Respondent.

1. CRIMINAL LAW—MURDER—EVIDENCE—DYING DECLARATIONS—FOUNDATION—SUFFICIENCY.—Testimony that decedent passed witness's house, one hundred and fifty feet from decedent's home, five or ten minutes before witness heard shots in that direction, and that immediately witness opened the door and heard decedent at witness's gate calling him; that decedent came to witness's house and sank down on the ground apparently badly wounded; that witness assisted decedent to lie down and called for help; that decedent exclaimed at the time, "I am shot through and through," "I am full of blood and can't live ten minutes"; that decedent then made a statement·as to how the shooting occurred, and immediately afterwards became unconscious and so remained until he died, an hour and a half later, coupled with other testimony showing that defendant and decedent's wife were at decedent's home, occupying suspicious relations, at the time he entered, is sufficient foundation for the introduction of such dying declarations.

2. SAME—SAME—SAME—SAME—SAME—MUST BE MADE UNDER SENSE OF IMPENDING DEATH.—It is essential to the admissibility of dying declarations, and is a preliminary fact, to be proven by the party offering them in evidence, that they be made under a sense of impending death; but it is not necessary that they should be stated at the time to be so made. It is enough if it satisfactorily appears in any mode that they were made under that sanction. The length of time which elapsed between the declaration and death furnishes no rule for the admission or rejection of the testimony, though it may serve as evidence as to deceased's belief that his dissolution was or was not impending.

3. SAME—SAME—EVIDENCE—INSTRUCTIONS—DEFENDANT TRESPASSER.—An instruction, based upon .evidence tending to show that at the time of the shooting defendant was àt deceased's house occupying suspicious relations with deceased's wife, using the expressions "a trespass" and "a trespasser" with reference to the conduct of the defendant, and with reference to the defendant being at the house, is proper.

HAWKINS, J., dissenting.

APPEAL from a judgment of the District Court of the Fourth Judicial District in and for the County of Apache. John J. Hawkins, Judge. Affirmed.

The facts are stated in the opinion.

W. T. Johnston and Robert E. Morrison, for Appellant.

Francis J. Heney, Attorney-General, and T. G. Norris, for Respondent.

ROUSE, J.—Appellant was indicted in the district court of Apache County in April, 1893, and accused of the crime of murder in the killing of one Ike Lee. He pleaded not guilty, and at the April term, in 1894, of said court, was tried, found guilty of murder as charged in the indictment, and sentenced to the territorial prison for forty years. A motion to set aside the verdict and for a new trial was made by defendant, for the reasons: 1. That the court erred in admitting in evidence declarations of the deceased, as dying declarations; 2. That the court erred in refusing a certain instruction requested by defendant, and in modifying certain instructions requested by him, and in giving certain instructions requested by the prosecution, and also on its own motion; 3. That the verdict is against the law, and not sustained by the evidence; 4. That the court erred in permitting the district attorney to use a diagram of his own making, not in evidence, in his closing argument to the jury. Said motion was overruled, and defendant duly excepted, and appeals, and assigns as error the said several points urged for a new trial.

The evidence discloses the fact that defendant was seen in Ike Lee's house, in Holbrook, in the early part of the night of the ninth day of November, 1892. Defendant and Mrs. Lee, the wife of deceased, were occupying chairs, facing each other, so close together that he had his foot on her chair, and was leaning forward towards Mrs. Lee, who was sitting erect. They were conversing with each other. The witness who saw the parties in that position testified that after he had walked about one hundred yards, he heard some shots or reports of some kind of firearms. One witness, a Mr. Bowman, testified that he resided about one hundred and fifty feet from Ike Lee's house, on November 9, 1892; that after he had retired for the night, and about half-past eight o'clock P. M., he heard some one walking by his house, and he got up to see who it was. It being dark, he could not see the person who was walking by, and he inquired who it was, and the person responded,

and witness knew by the voice that it was Ike Lee's, and from his voice and movements he judged he was in good condition physically. Witness returned to his bed, and in a short time, perhaps five or ten minutes, he was startled by the reports of three shots from some kind of firearms, exploded in the direction of Lee's house in quick succession. Witness got up immediately, and opened his door, and then heard Lee, at witness's gate, calling him. Witness's gate, where Lee was when he called witness, was about twenty-five feet from witness's house. Lee entered the gate, came to the house, and sank down upon the ground, apparently badly wounded. His condition was such, or his actions were such, as to cause the witness to believe that he was badly injured, and witness, acting on such belief, assisted him to lie down, and called for help. Lee exclaimed at the time, "I am shot through and through"; "I am all full of blood, and can't live ten minutes." He also exclaimed, in effect, "I am shot through the body." The witness testified that from the time he heard the shots until Lee was heard at his gate it was a very short time, not more than one minute or two minutes; as soon as Lee arrived at witness's house and witness observed his condition, he called for help to take Lee into the house; that help came immediately; that Lee made the exclamations above mentioned before the help arrived. Witness then testified that they took up Lee, and carried him into the house, and that immediately he became unconscious, and remained so until he died, which was about one and one half hours thereafter. The court then permitted the witness to testify as to the statements made to witness by Lee as to who shot him, and as to how it occurred, as dying declarations.

It is essential to the admissibility of dying declarations, and is a preliminary fact to be proven by the party offering them in evidence, that they were made under a sense of impending death; but it is not necessary that they should be stated at the time to be so made. It is enough if it satisfactorily appears in any mode that they were made under that sanction; whether it be directly proved by the express language of the declarant, or be inferred from his evident danger, or the opinions of the medical or other attendants, stated so to him, or from his conduct, or other circumstances of the case, all of which are resorted to in order to ascertain

the state of declarant's mind. 1 Greenleaf on Evidence, 11th ed., sec. 158; *State* v. *Nocton,* 121 Mo. 537, 26 S. W. 551; *People* v. *Taylor,* 59 Cal. 640; *People* v. *Gray,* 61 Cal. 164, 44 Am. Rep. 549; *State* v. *Evans,* 124 Mo. 397, 28 S. W. 8. Immediately after the declarations were made, the declarant was placed upon a cot, and almost instantly became unconscious, and remained that way until his death, which occurred about one and one half hours thereafter. The length of time which elapsed between the declarations and the death of declarant furnishes no rule for the admission or rejection of the evidence, though, in the absence of better testimony, it may serve as one of the exponents of the deceased's belief that his dissolution was or was not impending. 1 Greenleaf on Evidence, 11th ed., sec. 158.

We think the dying declarations, under the showing made, were properly admitted in evidence. Those declarations, in effect, were that declarant, when he got home, found defendant and another in his house; that he ordered them away; that they got into a quarrel; that defendant took declarant's pistol away from him, and shot at him three times, hitting him with the second shot. When asked why defendant shot him, Lee replied, "You know why." The evidence disclosed the fact that Lee had left home the morning before he was killed, for his work, which, in the nature of things, was expected to keep him from home for some time. We know nothing from the record of Lee's movements during the day, or where he was from an early hour in the day until after dark. He was then seen within one hundred and fifty feet of his house, and less than ten minutes before he was shot. We know from the evidence that about the time Lee was seen defendant was in Lee's house with Lee's wife, occupying suspicious positions with reference to each other. What Lee saw when he got home is not disclosed by the record. By his dying declarations we learn that defendant was there, and was ordered away; that defendant secured Lee's pistol, and shot at Lee three times; that Lee was wounded unto death. Lee's house was examined next day, and it bore the physical evidences of having been recently the scene of an altercation in which firearms had been used. The visit of defendant to Lee's house, after night, and in Lee's absence, and when it was to be reasonably supposed that he was to be absent for several days,

and the positions in which Mrs. Lee and defendant were seen relative to each other, lead us to believe that Lee's answer to the question, "What did he shoot you for?" that "You know why," was an intelligent and pointed answer, and one readily and easily understood.

Counsel complains of the instructions in which the learned judge used the expressions "a trespass" and "a trespasser," with reference to the conduct of the defendant, and with reference to the defendant being at Lee's house. Under the facts disclosed by the record, we feel that the judge should be commended for the use of those expressions, which were so exceedingly charitable towards the defendant. The evidence was sufficient to warrant the verdict, and, there being no error committed on the trial, the judgment should be affirmed; and it is so ordered.

Baker, C. J., and Bethune, J., concur.

Hawkins, J., dissents.