[No. 1673.]

THE STATE OF NEVADA, RESPONDENT, *v.* FRED
   ROBERTS, J. P. SEVENER, AND T. F. GORMAN,
   APPELLANTS.

1.  HOMICIDE—EVIDENCE—DYING DECLARATIONS—SENSE OF IMPENDING DEATH.
    The sense of impending death necessary to render a dying declaration
    admissible may be shown, not only by what the injured person said,
    but by his conduct and condition, and by the nature and extent of his
    wounds; and, if these show that the declaration was made without
    expectation of recovery, the declaration is admissible, though the
    declarant may not have said that he was without hope, or that he was
    going to die.

2.  SAME—SUFFICIENCY OF PREDICATE. In a prosecution for murder, it was
    shown as a predicate for the introduction of a dying declaration that
    deceased had been shot through the lungs and stomach the night
    before the declaration was made, and had said then, and several times
    afterwards, that he was going to die. The morning after the shooting
    a physician probed the wound and removed a quantity of blood, which
    enabled deceased to breathe more easily, so that he thanked the phy-
    sician and said that he felt better, but still shook his head when it
    was intimated that there was hope of recovery. *Held,* that it suf-
    ficiently appeared that deceased was without hope of recovery, so that
    his written statement was admissible as a dying declaration.

3. SAME—EVIDENCE—IDENTIFICATION OF ASSAILANT BY DECEASED.  In a prosecution for murder, evidence that deceased, who had been shot by men who were at the time unknown to him, had on the next day, and while under such a sense of impending death as to render a dying declaration admissible, recognized defendants as the men who shot him, and picked them out from a number of other men, all of whom were strangers to deceased, was admissible.

4. SAME—ADMITTED FACTS—HARMLESS ERROR.  In a prosecution for murder committed by shooting deceased through the stomach, evidence that after the shooting deceased said to a companion that he was shot through the stomach was harmless, even if it was not so connected with the shooting as to be part of the res gestæ.

5. SAME.  In a prosecution for murder, in which it was admitted that deceased had been robbed and murdered by some one, and the only defense was an alibi, evidence by a companion of deceased as to what he did after deceased was shot was harmless.

6. CRIMINAL LAW—EVIDENCE OF INDEPENDENT CRIME.  In a prosecution for murder committed on a west-bound freight train at a point a short distance east of a certain station, defendants claimed that they had been at this station during all the evening and night of the murder, while the state claimed that defendants had left the station on an east-bound train, and had dismounted from it where it slowed to pass the west-bound train, and had returned on the latter.  The train schedule was such that, if defendants had left on the east-bound train, they could not have returned to the station in question, except on the west-bound train, on which the murder was committed; and it was admitted that defendants were at this station shortly after the arrival there of the west-bound train.  Held, that evidence that defendants had on the night of the murder robbed a man on the east-bound train and taken from him certain coins, which were found in their possession the next morning, was admissible, although it related to an independent crime.

7. SAME—PHOTOGRAPHS OF WOUNDS.  In a prosecution for murder, photographs showing the nature of deceased's wounds before their appearance had been altered by surgical operation were properly admitted.

8. SAME—WITNESSES—EXAMINATION—HARMLESS ERROR.  In a prosecution for murder, defendant as a witness in his own behalf testified on a direct examination that he had served a term in a state prison, and on cross-examination was asked if he had ever been arrested for any other offense, to which he replied that he had been arrested for being drunk.  The prosecuting attorney then said that as that was a misdemeanor he did not care anything about it, but only wanted to ask if defendant had been convicted of any other felony.  Only a general objection was made to the question as to other offenses, and no motion was made to strike out the answer.  Held that, under civil practice act, 377 (Comp. Laws, 3472), and act relating to crimes and punishments, sec. 12 (Comp. Laws, 4667), providing the conviction of a felony may be shown to affect the credibility of a witness, and under the objection made, permitting the question to be asked was not prejudicial error.

9. HOMICIDE—EVIDENCE—SUFFICIENCY.  In a prosecution for murder, evidence held sufficient to support a conviction.

APPEAL from the District Court, Washoe County; *B. F. Curler*, Judge.

Fred Roberts and others were convicted of murder, and appeal. **Affirmed.**

The facts sufficiently appear in the opinion.

*Huskey & Martinson* and *Wm. Woodburn*, for Appellants:

I. It is respectfully submitted to this court to admit as a dying declaration by Jack Welsh, the written statement introduced in the case and marked State's Exhibit J. This statement was offered as a written dying declaration of the deceased. To that offer, the defendants objected in substance as follows: That the declarations are hearsay; that their admission would violate the constitutional right of these defendants to be confronted by the witnesses against them; that they do not come under the exception to the hearsay rule, known as dying declarations; that declarant was not *in extremis;* that declarant was not conscious of immediate death; that declarant had not abandoned all hope or expectation of recovery; that a belief that declarant will ultimately die is not sufficient, and no more than this has been shown; and that this is not a written statement by Welsh, signed by him. Dying declarations as evidence are viewed with disfavor. Greenleaf, in treating this subject, remarks: "Credit is not in all cases due to the declarations of a dying person; for his body may have survived the powers of his mind, or his recollection, if his senses are not impaired, may not be perfect; or for the sake of ease, and to be rid of the importunity and annoyance of those around him, he may say, or seem to say, whatever they choose to suggest." (1 Greenleaf, 16th ed. sec. 156a.) Clearly these are matters that go to the weight of the evidence, and not primarily to the question of admissibility. Yet these or like considerations have restricted the scope of dying declarations as evidence. They are not admissible in civil cases, nor in any criminal case other than that of homicide. The apparent infirmities of this class of evidence have been relied upon to exclude the dying declarations from use in the vast majority of cases, and permitted

it only upon one question, the causes and circumstances of the death of the deceased, where such death is the subject of the trial.

"Because of their inherent infirmities as evidence dying declarations should be closely scrutinized and great care and caution exercised in determining them to be admissible. They should not be admitted unless the prerequisites which are essential to their admissibility are clearly established." (10 Am. & Eng. Ency. of Law, 387; *People* v. *Hodgdon*, 55 Cal. 72; *People* v. *Sanchez*, 24 Cal. 24; *People* v. *Taylor*, 59 Cal. 646; *Boyle* v. *State*, 55 Am. Rep. 218; *Nelms* v. *State*, 53 Am. Dec. 94; *State* v. *Skepton*, 64 Am. Dec. 587.)

The preliminary requisites to the admissibility of dying declarations as evidence in homicide cases like the present one, are, in syllabus, as follows:   (1) The declarant must be *in extremis;* (2) the declarant must have been under a sense of impending death, and hope must have been abandoned; (3) death must result.  The declarations must concern the circumstances of the homicide which is the subject of the charge.  (Greenleaf on Evidence, 16th ed. vol. 1, chap. 14; 10 Am. & Eng. Ency. Law, 2d ed. 364–373.)   The objection of the defendants that Jack Welsh, at the time he made the declaration, was not under a sense of impending death and had not abandoned all hope of recovery, should have been sustained.  The time of death is not a part of the statement. We must look to the surrounding circumstances and to other declarations of the deceased to determine whether he believed he was in danger of almost immediate dissolution.  That the declaration must be made under a sense of impending death, and of almost immediate dissolution, is amply sustained by the authorities.  (*People* v. *Hodgdon*, 55 Cal. 72; *People* v. *Ah Dat*, 49 Cal. 652; *Whittaker* v. *State*, 3 S. E. 403; 1 Greenleaf, 16th ed. sec. 153.)

Welsh did not state in his declaration in so many words that death was near.  A belief in death is not enough. Declarations must apprehend almost immediate dissolution. (10 Am. & Eng. Ency. of Law, 2d ed. 365, 368; *People* v. *Sanchez*, 24 Cal. 17; *People* v. *Ah Dat*, 49 Cal. 652; *People* v. *Gray*, 61 Cal. 64; *Whittaker* v. *State*, 3 S. E. 403; *Tracy* v.

*People,* 97 Ill. 101.) The proof must clearly show that the deceased was at the very point of death, and that he was fully aware of the fact. (*Morgan* v. *State,* 31 Ind. 193.)

Although the declarant need not be literally breathing his last, he must understand that his injuries are fatal, and believe that death is near at hand. (*Com.* v: *Haney,* 127 Mass. 455.) Greenleaf, in dealing with this topic, after stating that it is not the length of time which elapses between the declaration and the death that furnishes the test, continues: "It is the impression of almost immediate dissolution, and not the rapid succession of death in point of fact, that renders the testimony admissible. Therefore, where it appears that the deceased, at the time of the declaration had any expectation or hope of recovery, however slight it may have been, and though death actually ensued in an hour afterwards, the declaration is admissible. On the other hand, a belief that he will not recover is not itself sufficient, unless there be also the prospect of almost immediate dissolution." (1 Greenleaf, 16th ed. 158.)

Dying declarations are admissible only upon the theory that the "solemnity of the moment of death creates an obligation equal to that which is imposed by a positive oath in a court of justice." Can it be said that Welsh was impressed by the "solemnity of the moment of death" when he said that death was not imminent, but only a matter of time? He did not feel at that time that he was on the point of death; he said in effect it was not a matter of the instant, but a matter of time. It does not clearly appear that at the time the statement was made Welsh had abandoned all hope of recovery. Immediately after the operation he said he felt better, and the only expression that he made as to his condition after the operation was in response to the district attorney's question, and is embodied in the written declaration. He got immediate relief; he expressed the relief he felt; and it is significant that he no longer said he was going to die, except upon the suggestion of the district attorney, who was trying to get a statement that could be used in evidence. Added to the expression of relief from suffering, we find that later in the day he asks the doctor if he is going to

get well. Welsh's condition may be shown by statements made both before and after the declarations in question. Before the operation Welsh was in desperate condition. He stated several times that he was going to die. After the operation he felt better and was better. He said so. He ceased saying that he was going to die. He said he felt better, and he thanked the doctor. Do indications of feeling better and expressions referred to indicate a condition of hopelessness—a settled conviction of death? If deceased had the slightest hope of recovery, the declaration is not admissible. (10 Am. & Eng. Ency. of Law, 2d ed. 367; People v. Hodgdon, 55 Cal. 72; Graves v. People (Colo.) 32 Pac. 63; Matherly v. Com.; 19 S. W. 977; Com. v. Bishop, 165 Mass. 148, 42 N. E. 560; Bell v. State (Miss.) 17 South. 232; Peake v. State (N. J.) 12 Atl. 701; State v. Bannister (S. C.) 14 S. E. 678; Irby v. State (Tex.) 7 S. W. 705.)

II. It was error to admit the statements of Jack Welsh identifying the defendants as the men who robbed and shot him. It appears from the evidence in the case that after the defendants were arrested they were taken to the bedside of the deceased for the purpose of identification, and that Welsh said they were the men who robbed and shot him. The offer of the state is as follows: The state offers it as a dying declaration; and further it offers the testimony of the verbal declarations of the deceased as connected with the body of the crime charged, and as evidence tending to show the conduct of the defendants at the time they were identified by the deceased and accused of the crime, and as evidence tending to show that before his death Welsh identified each of these defendants as being present and concerned in the crime which resulted in his death. The state offers this testimony as a verbal dying declaration of the deceased, and also as part of the res gestæ of the crime and as evidence tending to show the conduct of the defendants at the time they were identified by the deceased and accused by him of the crime. To that offer the defendants objected that the proper foundation had not been laid to its introduction as a dying declaration; that it was not res gestæ; that it was not properly an admission of confession on the part of the defendants; that mere

silence of an accusation of guilt is not an acquiescence so as to amount to an admission; that it does not appear that the defendants were given an opportunity to reply.

III.   The term *res gestœ* is defined in the case of *Lund* v. *Tyngbourough*, 9 Cush. 36, as follows: "When the act of a party may be given in evidence, his declarations made at the time, and calculated to elucidate and explain the character and quality of the act, and so connected with it as to constitute one transaction, and so as to derive credit from the act itself, are *res gestœ*." (24 Am. & Eng. Ency. of Law, 2d ed. 662; 1 Greenleaf, 16th ed. sec. 108; 2 Jones on Evidence, sec. 347; *State* v. *Daugherty*, 16 Nev. 376.)

IV.   No inference of guilt is warranted by silence on the part of defendant when under arrest. (Wharton's Crim. Ev. 9th ed. sec. 680; *Com.* v. *Kenney* (Mass.) 46 Am. Dec. 622; *Com.* v. *McDermott* (Mass.) 25 Am. Rep. 120; *Com.* v. *Walker* (Mass.) 13 Allen, 570; *Gardner* v. *State* (Tex.) 34 S. W. 945.)

V.   We conceive that it is clear that it is not relevant nor proper to show that the defendant has committed other similar acts or crimes which are not connected in any way with the one in question. (*Boyd* v. *U. S.*, 142 U. S. 450; *Ogle* v. *Brooks* (Ind.) 44 Am. Rep. 778; *Com.* v. *Jackson*, 132 Mass. 16; *State* v. *Lapage* (N. H.) 24 Am. Rep. 69; *People* v. *Gibbs*, 93 N. Y. 470.)   Such evidence may be admissible to show fraud or a fraudulent intent, to rebut the inference of accident, or to establish a plan.   The facts in this case do not raise any of these questions.   It is contended that it is admissible for the purpose of showing that the defendants were in the vicinity of the crime at the time of its commission.   Admitting that the state may prove by the witness that the defendants were on train No. 220, it was error to show what occurred at that time and place. (*Com.* v. *Grief* (Ky.) 27 S. W. 814; *State* v. *Flynn* (Mo.) 27 S. W. 1105; *People* v. *Jones*, 31 Cal. 565; *Com.* v. *Campbell* (Mass.) 83 Am. Dec. 705; *People* v. *Schweitzer*, 23 Mich. 301; *State* v. *Hoyt*, 13 Minn. 132; *Roper* v. *Territory* (Ariz.) 33 Pac. 1014; *Marshall* v. *State* (Tex.) 22 S. W. 878.)

It was error to admit in this case the pictures of the body

of the deceased, and of the mutilated portions thereof, to wit, plaintiff's exhibits D, E, and F. The state offers the pictures as photographs of the wounds upon the body of Jack Welsh. They were not offered as independent testimony, but for the purpose of illustration. The defendants' objection is as follows: "We object to these cards as evidence in this case upon the ground that a proper foundation has not been laid for their introduction, and on the ground that photographs are, at the best, only secondary evidence, and we call the attention of the court to 22 Ency. of Law, 2d ed. 772, note 3, etc., and we object on the further ground that the photographs appeal to the prejudice and passion of the jury, and do not in any way aid the witness in giving his testimony." The objection was overruled and the pictures admitted. Photographs are, at best, only secondary evidence, and are admissible when better evidence cannot be had or has not been produced. ( *White Sewing Machine Co.* v. *Gordon* (Ind.) 19 Am. St. Rep. 109; *Baustian* v. *Young* (Mo.) 75 Am. St. Rep. 462; *Eborn* v. *Zimpelman* (Tex.) 26 Am. Rep. 315; *Church* v. *Milwaukee*, 31 Wis. 512; *Perkins* v. *Bauss* (Tex.) 32 S. W. 240; 22 Am. & Eng. Ency. of Law, 2d ed. 772.) Photographs appealing to the passion of the jury and neither necessary nor instructive are inadmissible. ( *Ludlein* v. *Meyer*, 95 Mich. 586; *Selleck* v. *Janesville* (Wis.) 76 Am. St. Rep. 892; *Baxter* v. *Chicago R. R. Co.* (Wis.) 80 N. W. 644; *Fore* v. *State* (Miss.) 23 South. 710; *State* v. *Miller* (Or.) 76 Pac. 666.)

VI. For the numerous errors committed this cause must be reversed and a new trial granted.

*James G. Sweeney*, Attorney-General, for Respondent:

I. Both the dying and written declarations of Jack Welsh were clearly admissible. The evidence shows beyond any question of a doubt that at the time of making the declarations he was fully conscious of impending death; that he had abandoned all hope and expectation of recovery; that at the time of making the declarations he was entirely conscious, and in full possession of his intellectual faculties. The declarations were admissible upon the ground of indentification. ( *Mattox* v. *U. S.*, 146 U. S. 140; *Commonwealth* v. *Roddy*, 184

Pa. St. 274; *Brotherton* v. *People,* 75 N. Y. 159; *State* v. *Freeman,* 1 Spears (S. C.) 57; *McLean* v. *State,* 16 Ala. 672; 10 Am. & Eng. Ency. 2d ed. 383; Transcript, pp. 76 and 77.) The dying declarations were admissible in evidence, they having been made in the presence of defendants, and were admissible for the purpose of showing defendants' conduct and behavior when identified and charged as being his assailants and accused of the crime, for which purpose they were specifically offered. (*State* v. *Nash and Redout,* 7 Iowa, 347; *State* v. *Gillick,* 7 Iowa, 287; *State* v. *Brunetto,* 13 La. Ann. 45; *Kendrick* v. *State,* 55 Miss. 436; *Powers* v. *State,* 74 Miss. 777; *Donnelly* v. *State,* 26 N. J. L. 463; 10 Am. & Eng. Ency. Law, 2d ed. 360.) The rule as to the admissibility of dying declarations does not require that they should have been made while the sufferer was literally breathing his last. If the declarations were made under a sense of impending dissolution, it does not matter if death failed to ensue until a considerable time after the declarations were made. (10 Am. & Eng. Ency. Law, 2d ed. 369, and authorities there cited.)

The length of time elapsing between the making of the declarations and the declarant's death is, however, one of the elements to be considered in determining whether the declarations were made under a sense of impending death. (10 Am. & Eng. Ency. of Law, 2d ed. 369, and authorities cited.) In this instance the deceased died within three hours of the rendition of the dying declarations. Even admitting, for the sake of argument, that deceased was partially unconscious, and which we strenuously deny, and refer to the evidence, the declarations were admissible, and the objections should go to their credibility and not their admissibility. (*Hays* v. *Commonwealth* (Ky. 1890) 14 S. W. Rep. 833; 10 Am. & Eng. Ency. of Law, 376, under note, "Narcotics.") A positive statement by the victim identifying the defendants as his assailants is not an expression of opinion, but a statement of fact where the victim had opportunities for observation. (10 Am. & Eng. Ency. Law, 2d ed. 378.) Dying declarations of deceased as to the state of declarant's mind are proved by the express or direct language of the declarant.

(10 Am. & Eng. Ency. Law, 2d ed. 388.)    We submit to the
court that the evidence shows that the dying declarations
made by Welsh were as plain, concise, and intelligent as the
English language could make them; that his answers in
response to queries put to him were direct, responsive, and
relevant.    The condition and conduct of declarant as to the
sense of impending dissolution may be inferred from the
apparent condition and nature of his injuries and his con-
duct and deportment.    (10 Am. & Eng. Ency. Law, 2d ed.
389.)    We submit that his condition, conduct, and deport-
ment were those of a dying man in full possession of his
intellectual faculties, but resigned to his fate.

II.    The photographs admitted in this proceeding were
properly admissible upon several grounds.    They were clearly
admissible for the purpose of identification.    (*People* v. *Smith*,
121 N. Y. 578; *Crane* v. *Horton & Co.*, 5 Wash. 479; *United
States* v. *Pagliano*, 53 Fed. 1001; *United States* v. *Lot of Jew-
elry*, 59 Fed. 684; *Travelers Ins. Co.* v. *Sheppard*, 85 Ga. 751;
*Beavers* v. *State*, 58 Ind. 530; *Brooke* v. *Brooke*, 60 Md. 524;
*Commonwealth* v. *Campbell*, 155 Mass. 537; 22 Am. & Eng.
Ency. Law, 2d ed. 773, note 5.)    They were admissible upon
the ground that they aided the jury in applying the evidence.
(*People* v. *Durrant*, 116 Cal. 179; Rice, Crim. Ev. 154; Whar-
ton, Crim. Ev. 9th ed. 544; Thomson on Trials, sec. 869;
*Udderzook* v. *Commonwealth*, 76 Pa. St. 340; Bishop, New
Crim. Proc. sec. 1097; *People* v. *Fish*, 135 N. Y. 136; *Com-
monwealth* v. *Campbell*, 155 Mass. 537; *Ortis* v. *State*, 30 Fla.
256; *Dederichs* v. *Salt Lake City Ry. Co.*, 14 Utah, 137; *Red-
din* v. *Gates*, 52 Iowa, 210, 213; Transcript, pp. 126–130.)
They were admissible as explanatory or illustrative evidence
in enabling witnesses to make their testimony clearer, and to
enable jurors to understand it better.    (*Alberti* v. *N. Y. L. E.
& Western R. R. Co.*, 6 L. R. A. 765; *Reddin* v. *Gates*, 52 Iowa,
213; 22 Am. & Eng. Ency. Law, 2d ed. 774.)    The court's
attention is particularly directed to the fact that Dr. Giroux
in testifying made use of these photographs for the purpose
of better illustrating his testimony, so that the jury was bet-
ter enabled to understand his testimony, and also for the
purpose of identifying the body of the deceased.    It is a

matter of discretion with the trial judge to admit or exclude photographs offered in evidence. (22 Am. & Eng. Ency. Law, 2d ed. 776.)

They are admissible if they are instructive to the jury and it is within the discretion of the trial judge to admit or exclude them on the question of whether or not they are instructive. They were instructive. They were admitted in evidence for the purpose of the identification of Jack Welsh; for the purpose of identifying the deceased as a person on whom Dr. Giroux performed the autopsy, and as the person whom he treated in the hospital at the time of which he was testifying; for the purpose of illustrating and showing the nature, character, course, and extent of the wounds that were inflicted upon the body of Jack Welsh, and as illustrative of the testimony of Dr. Giroux and several witnesses in reference thereto. (*Verran* v. *Baird*, 150 Mass. 141; *Gilbert* v. *West End Street Ry. Co.*, 160 Mass. 403; *Harris* v. *Quincy*, 171 Mass. 472; *Carey* v. *Inhabitants of Hubbardston*, 172 Mass. 106.) If photographs are admissible, the sole question to be determined is whether or not they represent faithfully that which they are intended to portray. The photographs were true representations, and faithfully represented what they portrayed. It does not make any difference who took the photographs. Photographs taken by amateurs are admissible if proven to be correct. (Underhill on Crim. Ev. par. 51, and authorities cited.) Photographs of the head and neck of a man, showing the wound, when proved to be the true representations of the location of the wound, were held admissible. (*People* v. *Fish*, 125 N. Y. 136; *Reddin* v. *Gates*, 52 Iowa, 210; *Alberti* v. *N. Y. L. E. & W. R. Co.*, 6 L. R. A. 765.) It is respectfully submitted that the errors assigned by appellants are devoid of legal merit and that the judgment of the lower court must be affirmed.

*Wm. Woodburn*, for Appellants, in reply:

I. It appears from the record on appeal that J. P. Sevener, one of the defendants, after the state rested its case, became a witness in his own behalf, and on his cross-examination by the prosecuting attorney the following questions were

propounded to him: Ever arrested for any other offense except the one in California? Defendant's attorney objected to said question. The court overruled the objection. Defendant's attorney excepted to the ruling of the court. Answered by defendant: "I was a machinist in the navy yard at Vallejo, and was arrested for being drunk." Question by prosecuting attorney: ·I want to ask you if you were ever convicted of a felony except the one which you served for. You know what a felony is—a penitentiary offense, not a county jail offense. I didn't care anything about that. These questions were clearly inadmissible because they did not tend to impeach the credibility of the witness, and were not in cross-examination of any matter testified to in the direct examination, and tended to prejudice the minds of the jurors against the defendants; their admission is error. (*State* v. *Hoff*, 11 Nev. 18; *Newcomb* v. *Griswold*, 24 N. Y. 298; *Gale* v. *People*, 26 Mich. 158; 1 Greenleaf Ev. sec. 458.)

II. The testimony is insufficient to warrant the conviction of Fred Roberts, one of the defendants. Albert Waldman, the companion of Jack Welsh on train No. 219 on the 19th day of August, 1903, testified that he recognized the defendant as being in company with Sevener and Gorman and he asked him for a match. He said he had no matches; that he could get matches over there, pointing to the other car; that Roberts had no arms and went to get matches to the other car. After Roberts disappeared the other three drew pistols, exclaiming: "Throw up your hands, you sons of b——." Then they assaulted and robbed them; then yelled to the latter: "You sons of b——." Waldman, in clear and unmistakable language, swears that Roberts inflicted no injury upon him or Welsh. ·T. T. Townsend, who was assaulted and robbed on train No. 220, identified Sevener, Gorman, and Williams as his assailants, but did not see Roberts. The evidence of Mohn, the brakeman on train No. 220, given at the first trial of this cause and read at last trial, shows that Roberts was seated on a flat-car loaded with lumber, and he flashed his lantern to ascertain who it was. The dying declaration of Jack Welsh, even if admissible, fails to show that Roberts on train No. 219 on the night of August 19, 1903, assaulted

or robbed Waldman or Welsh or either of them, or in any way aided or assisted the perpetrators of the crime. In view of the testimony of Waldman and Townsend and the condition of Welsh at the time, it is claimed he identified the four defendants, and all of the circumstances connected with such identification renders it extremely unreliable as far as Roberts is concerned; his presence does not make him an accomplice or accessory.

III. The most common use of photographs is to enable witnesses to make their testimony clearer and juries to understand it better. They are admissible when the identification of the accused is in issue to show his changed appearance at different times. They are like maps and diagrams permitted as evidence showing the scene of the homicide and the facts surrounding the homicide in support of the theory of the prosecution. (*People v. Whalen*, 123 Cal. 551; *People v. Crandall*, 125 Cal. 133.) At best photographs are but secondary evidence, only admissible when lack of better evidence compels a resort to them. (Rice on Ev. vol. 3, sec. 151.) They were not introduced for any legitimate purpose, because the identity of Welsh was never questioned. The witnesses Kelley and Albert Waldman, the companions of Welsh, were on the freight train and witnessed the assault on Welsh and identified him. The man for whom Welsh worked identified him before he died. Welsh told who he was, and therefore there was no necessity for the introduction of his photograph. The wounds on the body of Welsh and the course of the bullets were accurately described by Dr. Giroux, Welsh's physician, and the pain he suffered. The photographs were not taken until the day after Welsh died; they were taken by one Kenyon, an employee of the Southern Pacific Railroad Company, who was not following the business of a photographer, and who was not shown to have learned the art of photography. They were not substantially necessary or instructive to show any material facts or conditions, and are of such a character as to arouse sympathy or indignation, or divert the minds of the jury to improper or irrelevant considerations. (*Selleck v. City of Janesville*, 104 Wis. 575; *Sebert v. West End St. R. R. Co.*, 160 Mass. 403–405; *Harris v. Quincy*, 171

Mass. 472; *Fore* v. *State*, 75 Miss. 527; *State* v. *Miller*, 74 Pac. 653; *Dobson* v. *Philadelphia*, 7 Penn. 321.)

IV.   Upon these two foregoing assignments of error we respectfully submit that the judgment of the court below should be reversed and a new trial ordered.

*James G. Sweeney*, Attorney-General, for Respondent, in reply:

I.   Both the dying and written declarations of deceased were clearly admissible.   The evidence shows beyond any question that at the time of making the declarations he was fully conscious of impending death; that he had abandoned all hope and all expectation of recovery; that at the time of making the declaration he was entirely conscious, and in full possession of his intellectual faculties.   The evidence shows clearly and beyond any question of doubt that Welsh was in a dying condition from the time he was brought to the hospital on the day he made the oral and written dying declarations until he died, and the evidence shows clearly that he was treated and considered as a dying man.   Every witness who saw him testified to that effect.   The transcript is one mass of evidence in favor of the above legal requisites necessary to the admission of dying declarations.   The declarations were admissible upon the ground of identification. (*Mattox* v. *U. S.*, 146 U. S. 140; *Commonwealth* v. *Roddy*, 184 Pac. 274; *Brotherton* v. *People*, 75 N. Y. 159; *State* v. *Freeman*, 1 Spears (S. C.) 57; *McLean* v. *State*, 16 Ala. 672; 10 Am. & Eng. Ency. 2d ed. 383.)

The dying declarations of deceased were admissible in evidence, they having been made in the presence of defendants, and were admissible for the purpose of showing defendants' conduct and behavior when identified and charged as being his assailants and accused of the crime, for which purposes they were specifically offered.   The declarations were clearly admissible, not for the purposes argued by counsel to show that the silence of the prisoners was tantamount to a confession of guilt, but tending to show the demeanor and bearing and behavior of the defendants at the time that they were identified by the deceased.   For instance, Mr.

Stanton, Sheriff Lamb, Judge Robbins, and others testified that when the defendants were identified their faces turned pale, and they trembled and showed signs of nervousness. (*State* v. *Nash and Redout*, 7 Iowa, 347; *State* v. *Gillick*, 7 Iowa, 278; *State* v. *Brunetto*, 13 La. Ann. 45; *Kendrick* v. *State*, 55 Miss. 436; *Powers* v. *State*, 74 Miss. 777; *Donnelly* v. *State*, 26 N. J. L. 463; 10 Am. & Eng. Ency. Law, 2d ed. 360.) The rule as to the admissibility of dying declarations does not require that they should have been made while the sufferer was literally breathing his last. If the declarations were made under a sense of impending dissolution, it does not matter if death failed to ensue until a considerable time after the declarations were made. The length of time elapsing between the making of the declarations and the declarant's death is, however, one of the elements to be considered in determining whether the declarations were made under a sense of impending death. (10 Am. & Eng. Ency. Law, 2d ed. 369, and authorities there cited.)

In this instance the deceased died within three hours of the rendition of the dying declarations. Even admitting, for the sake of argument, that deceased was partially unconscious, but which we strenuously deny, and refer to the evidence, the declarations were admissible, and the objections should go to their credibility and not their admissibility. (*Hays* v. *Commonwealth* (Ky. 1890) 14 S. W. 833; *People* v. *Beverly*, 108 Mich. 509; 10 Am. & Eng. Ency. Law, 2d ed. 376, under note, "Narcotics".) A positive statement by the victim identifying defendants as his assailants is not an expression of opinion, but a statement of fact where the victim had opportunities for observation. (10 Am. & Eng. Ency. Law, 2d ed. 378.) Dying declarations of deceased as to the state of declarant's mind are proved by the express or direct language of the declarant. (10 Am. & Eng. Ency. Law, 2d ed. 388.) We submit to the court that the evidence shows that the dying declarations made by Welsh were as plain, concise, and intelligent as the English language could make them; that his answers in response to queries put to him were direct, responsive, and relevant. The condition and conduct of declarant as to the sense of impending disso-

lution may be inferred from the apparent condition and nature of his injuries, and his conduct and deportment. (10 Am. & Eng. Ency. Law, 2d ed. 389.) The court's attention is particularly invited to pages 510 to 513 of the transcript wherein Mr. Warren properly lays the foundation for the admission of the declarations through Dr. Giroux. We submit that the condition, his conduct, deportment, and behavior were those of a dying man in full possession of his intellectual faculties, but resigned to his fate. Further, that at the time of the making of the oral and written dying declarations, the testimony shows unmistakably that Welsh not only knew and believed he was going to die, but that he was actually dying at the time, and was so treated by all who attended him.

II. The photographs admitted in this proceeding were properly admissible upon several grounds. They were clearly admissible for the purpose of identification. (*People* v. *Smith*, 121 N. Y. 578; *Crane* v. *Horton & Co.*, 5 Wash. 479; *United States* v. *Pagliano*, 53 Fed. 1001; *United States* v. *Lot of Jewelry*, 59 Fed. 684; *Travelers Ins. Co.* v. *Sheppard*, 85 Ga. 751; *Beavers* v. *State*, 58 Ind. 230; *Brooke* v. *Brooke*, 60 Md. 524; *Commonwealth* v. *Campbell*, 155 Mass. 537; 22 Am. & Eng. Ency. Law, 2d ed. 773, note 5.) The court's attention is directed to the testimony of Conductor La Point, wherein he specifically identifies Jack Welsh from a photograph handed him as being the man whom he picked up on August 20th . on the end of some ties near Zola siding. The court's attention is further directed to the testimony of Mr. N. S. La Point, wherein he states that he never saw Jack Welsh before nor since that date, thereby making the photograph a necessity in so far as identifying Jack Welsh was concerned as the man he picked up on the morning following the tragedy. The court's attention is further directed to Dr. Giroux's testimony, wherein he not only identifies Jack Welsh as the party upon whom he operated for the wounds received from the assault of the defendants, but also as to how he used the photographs as a means of making his testimony clearer to the jury. They were clearly admissible upon the ground that they aided the jury in applying the evidence. (*People* v. *Dur-*

*rant*, 116 Cal. 179; Rice, Crim. Ev. 154; Wharton's Crim. Ev. 9th ed. sec. 544; Thomson on Trials, sec. 869; *Udderzook* v. *Commonwealth*, 76 Pa. St. 340; Bishop's New Crim. Proc., sec. 1097; *People* v. *Fish*, 125 N. Y. 136; *Commonwealth* v. *Campbell*, 155 Mass. 537: *Ortis* v. *State*, 30 Fla. 256; *Dederichs* v. *Salt Lake City Ry. Co.*, 14 Utah, 137; *Reddin* v. *Gates*, 52 Iowa, 210, 213.)

They were admissible as explanatory or illustrative evidence in enabling witnesses to make their testimony clearer, and to enable jurors to understand it better. (*Alberti* v. *N. Y. L. E. & Western R. R. Co.*, 6 L. R. A. 765; *Reddin* v. *Gates*, 52 Iowa, 213; 22 Am. & Eng. Ency. Law, 2d ed. 774.) The court's attention is particularly directed to the fact that Dr. Giroux in testifying made use of these photographs for the purpose of better illustrating his testimony, so that the jury was enabled better to understand his testimony and also for the purpose of identifying the body of deceased, Jack Welsh.

IV. It is a matter of discretion with the trial judge to admit or exclude photographs offered in evidence. (22 Am. & Eng. Ency. Law, 2d ed. 776.) They are admissible if they are instructive to the jury, and it is within the discretion of the trial judge to admit or exclude them on the question of whether or not they are instructive. They were instructive. They were offered and admitted in evidence for the purpose of illustrating and explaining the testimony of the witnesses; for the purpose of the identification of Jack Welsh; for the purpose of identifying the deceased as the person on whom Dr. Giroux performed the autopsy and as the person he treated in the hospital at the time of which he was testifying; for the purpose of illustrating and showing the nature, character, course, and extent of the wounds that were inflicted upon the body of Jack Welsh, and as illustrative of the testimony of Dr. Giroux and several witnesses in reference thereto. (*Verran* v. *Baird*, 150 Mass. 141; *Gilbert* v. *West End Street Ry. Co.*, 160 Mass. 403; *Harris* v. *Quincy*, 171 Mass. 472; *Carey* v. *Inhabitants of Hubbardston*, 172 Mass. 106.)

If photographs are admissible, the sole question to be determined is whether or not they represent faithfully that which they are intended to portray. The photographs were

true representations and faithfully represented what they portrayed. (Testimony of Giroux, Kenyon, and La Point.) It does not make any difference who took the photographs. Photographs taken by amateurs are admissible, if proven to be correct. (Underhill on Cr. Ev. par. 51, and authorities cited.) Photographs of the head and neck of a murdered man, showing the wound, when proved to be true representations of the location of the wound, were held admissible in *People* v. *Fish*, 125 N. Y., 126. And subject to like limitations, the same rule was applied by the court in *Reddin* v. *Gates*, 52 Iowa, 213, and in *Alberti* v. *N. Y. L. E. & W. R. Co.*, 6 L. R. A. 765.

V. The admission of the testimony of Townsend was clearly admissible upon several grounds. It was admissible and competent to show by Townsend that defendants accused of this crime were in the vicinity of the perpetration of that crime a short time before or at the time the crime was committed. It was admissible and competent to show by testimony of Townsend that defendants had an opportunity to commit the crime. The evidence of Townsend giving reasons why he could identify the defendants as being the parties who were near the scene of the tragedy at the time of its occurrence is clearly admissible. The court's attention is particularly directed to the reasoning of the lower court before ruling on the objection interposed to the admission of the testimony of Townsend. The court most elaborately instructed the jury on the cardinal principle of law, founded on common justice, that the commission of one crime by a person or persons is no evidence of itself of the commission of another crime at a different time or place. "Relevant evidence is not admissible because indirectly proving or tending to prove another crime. All evidence is relevant which throws or tends to throw any light upon the guilt or innocence of the prisoner, and relevant evidence which is introduced to prove any material fact ought not to be rejected merely because it proves or tends to prove that at some other time the accused has been guilty of some other independent crime," etc. (Underhill on Cr. Law, 112 to 190.) "If evidence establishes a link in the chain of proof, it is relevant." (Jones on Evidence, sec. 143, vol 1.)

VI.   The evidence of Waldman objected to by the defend-
ants is also clearly admissible;. the same coming clearly
within the rules covering *res gestæ*.   It is not necessary, as
counsel insists, that all evidence to be admissible as a part
of the *res gestæ* should pertain to that which immediately
happened before or at the time of the commission of the act;
the great mass of authorities hold that it is competent and
proper to show any accompanying facts and circumstances
which are actually or substantially contemporaneous with it
and calculated to elucidate and explain its character.   (24
Am. & Eng. Ency. Law, 662–665.)   The simple reading of
the evidence of Waldman objected to will clearly demonstrate
the same being unmistakably connected with the commission
of the crime in issue, and necessarily becoming *res gestæ*.

VII.   Defendant Sevener having placed his character in
issue after voluntarily admitting that he had been arrested
in Vallejo for the commission of a misdemeanor, it was clearly
proper under the most elementary principle of criminal law
that the district attorney had the right to show up defend-
ant's character, and not only had the right to ask it of him-
self whether or not he had ever been convicted of any other
felony than the one for which he served in San Quentin, but
had the right by other witnesses to have gone into detail in
the criminal record of any of. the other defendants.   The
instructions of· the court instructing the jury that they
should not take into consideration the commission of the
other offenses by the defendants in determining the guilt or
innocence of defendants of the crime for which they were on
trial, would in itself have sufficiently cured this error, if
error it was admitted to be.

VIII.   Not only did Jack Welsh in his dying statement
assert that Roberts shot him, Roberts being referred to as
the "heaviest and shortest one of the lot," but also identified
him the day after the tragedy as one who took part in the
commission of the crime.   Waldman also testified that Roberts
was present.

By the Court, TALBOT, J.:

The defendants are three of the four who were convicted

of murder in the first degree in Humboldt County, and on a former appeal were granted a new trial by this court because a juror who had expressed an unqualified opinion regarding their guilt or innocence had been allowed to serve. (27 Nev. 449.) Later the case was transferred to Washoe County, and Frank Williams, who had been indicted, tried, and convicted jointly with these defendants, was there given a separate trial. They have again been convicted of murder in the first degree, and again appeal.

On August 19, 1903, Jack Welsh quit work in a hay field near Winnemucca, and about 8 o'clock, or half past, that evening, in company with Albert Waldman, left that town on west-bound freight train No. 219. About 11:45 that night, after stopping at Mill City and Humboldt House, this train slowed to a speed of from two to four miles per hour, and passed freight train No. 220, east bound, at Zola, a side track about four miles east of Oreana, the first station east of Lovelock. Directly after leaving Zola, four men appeared on the tops of the box cars and robbed Welsh and Waldman, and forced them off the train about two miles west of Zola, when it had reached a speed on the down-grade of from thirty to thirty-five miles an hour. As Welsh clung to the ladder on the side of the car and begged for his life, they stamped on his hands and shot him, until he fell to the ground. He called to Waldman, who had fallen first, and who, after a brief unconsciousness, came to him and went for assistance, but did not return until after he had been taken up and put in the caboose on a freight train about 7:30 in the morning, and taken to Winnemucca, where he arrived and was placed in the hospital a little after 9 o'clock that forenoon, and where he died at 7:15 that evening, nineteen and a half hours after he had been shot, and about twelve hours after he had been taken from the track, where he had lain for about seven and a half hours.

1. It is urged that the district court erred in admitting in evidence the following written dying declaration of the deceased: "My name is Jack Welsh. I am 20 years old. My home is in Palisade. I have no brothers. I know who shot me when I see them. The heaviest and shortest one of the

lot shot me. There were five men who attacked me. Al.
Waldman was with me. There were five men that attack me.
'Give me a match,' they says. 'I have no match,' says I.
'Throw up your hands, you son of a bitch,' and I did. They
went through my pockets. The one that shot me had some
kind of a shawl around his neck. I saw the fellow when he
shot me the first two times. I was only four feet from him.
This happened between 11 and 12 last night. I never saw
them before that I know of. The tallest man shot at me,
too. I never had any weapons of any kind. I was shot
through the lungs, because the wound whistled when I
moved. After I jumped off the train the heavy-set fellow
shot me. I know it was him, because he was on the edge of
the train and stamped on my hands. I believe I am going
to die, and so I make this statement.    J. C. Welsh."

Counsel for defendants objected to this statement upon the
grounds that it was hearsay; that its admission would violate
the constitutional right of the defendants to be confronted
by the witnesses against them; that it does not come under
the exception to the hearsay rule known as dying declara-
tions, for to be admissible as such it must be made by one
*in extremis* and fully conscious of impending death, and who
has abandoned all hope of recovery; that dying declarations
by one who was partially unconscious at the time he made
them are inadmissible; and that Welsh did not sign his com-
plete signature to the statement, because, when he had written
to the last letter in his name, another at his request had made
the "h."

That dying declarations must be made under a sense of
impending death in order to be admissible is well illustrated
by the cases cited in defendants' brief, and by many others;
but this may be shown, not only by what the injured person
said, but by his conduct and condition, and by the nature
and extent of his wounds, and it is sufficient if these show
that the declarations were made without expectation of
recovery and under a sense of impending death, notwith-
standing the declarant may not have said that he was with-
out hope or that he was going to die. (*Mattox* v. *U. S.*, 146
U. S. 151, 13 Sup. Ct. 50, 36 L. Ed. 917; *Anthony* v. *State*,

Meigs (Tenn.) 279, 33 Am. Dec. 143; *State* v. *Evans*, 124 Mo. 397, 28 S. W. 8; *State* v. *Schmidt*, 73 Iowa, 469, 35 N. W. 590; *White* v. *State*, 111 Ala. 92, 21 South. 330; *State* v. *Sullivan*, 20 R. I. 117, 37 Atl. 673; *People* v. *Simpson*, 48 Mich. 474, 12 N. W. 662; *State* v. *Russell*, 13 Mont. 164, 32 Pac. 854; *People* v. *Taylor*, 59 Cal. 640; *Bell* v. *State*, 72 Miss. 507, 17 South. 232; *Com.* v. *Matthews*, 89 Ky. 292, 12 S. W. 333; *Puryear* v. *Com.*, 83 Va. 54, 1 S. E. 512; *Johnson* v. *State*, 47 Ala. 9; *Com.* v. *Casey*, 11 Cush. 417, 59 Am. Dec. 150; *Morgan* v. *State*, 31 Ind. 194; *State* v. *Fletcher*, 24 Or. 295, 33 Pac. 575; *Dixon* v. *State*, 13 Fla. 639; *Lester* v. *State*, 37 Fla. 382, 20 South. 232; *Jackson* v. *State*, 56 Ga. 235; *State* v. *Wilson*, 24 Kan. 189, 36 Am. Rep. 257; *Com.* v. *Haney*, 127 Mass. 459.)

The controlling point here is a question of fact for the court—the state of mind of the deceased at the time he made the statement; for, if he were not then under a sense of impending death, the declarations would lack that solemnity and support which are necessary to make them admissible. In addition to other wounds, a bullet had entered the back about three inches from the spine, pierced the left lung and two walls of the stomach, shattered the seventh rib, and lodged in the intestines. The doctor probed, removed a splinter of bone, and opened the wound, so that about two pints of blood, which evidently came from the bullet hole in the lung, escaped from the pleura. This relieved a discharge of blood from the mouth, enabled the patient to breathe on the left side, eased his suffering to some extent, and prolonged his life, so that he lived for about eight hours after the operation. He thanked the doctor, and said he felt better; but, as he was aware of the serious nature of his wounds, this does not indicate that he had any expectation that he would survive. It is easy to distinguish between relief from pain and hope of recovery. (*State* v. *Evans*, 124 Mo. 397, 28 S. W. 8.)

In view of the injuries he had received and of which he was evidently aware, and of the various statements he made, a feeling and expression of relief from suffering does not imply that he expected to recover. Later, when in reply to

questions the doctor gave him words of encouragement, which no one aware of the gravity of his condition likely believed, he shook his head as an implication that he was without hope of recovery. To render the statement admissible, it was not necessary for him to predict the hour, or the day, or the specific time he would die. It is apparent that he was conscious of his hopeless condition and that death was near, and, when he said in his written and verbal statements that he was going to die, he meant and realized that dissolution was close at hand. He had told Waldman that fatal night that he was shot through the stomach, and Merchant and others in the forenoon that he could not live, and other witnesses in the afternoon that he was going to die because he was shot through the lungs and could hear the wind whistle. It would seem that only his youth, his unusual vitality, and the hand of fate enabled him to survive long enough to make a statement and identify the defendants. If his dying declarations are not admissible, it is difficult to conceive of but few cases in which they could be accepted. Considering all he said, the mortal nature of his injuries, and his dying, yet conscious, condition, it is reasonable to conclude that he was aware of the near approach of death, and consequently that his statement was made under that sense of impending dissolution which leads to a belief in its truth and sanctions its admission.

2. The four defendants indicted were arrested at Lovelock, taken to Winnemucca, and two at a time, mingled with twelve or more other men, strangers to Welsh, arranged around his bed. When touched, he opened his eyes and was asked: "Do you recognize any of these men?" When his gaze came to Roberts, he looked him straight in the face and said: "You shot me." When he saw Sevener, he said: "You are one, too. You helped to hold me up last night." And when he saw Gorman, he said: "You are one of them, too, that helped hold me up last night." It is claimed that the admission of these declarations of Welsh, identifying the defendants as the men who shot and robbed him, was error for different reasons. What we have already said in relation to the written statement makes them admissible as dying

declarations.   As such they are as definite and entitled to at least as much consideration as if Welsh had previously known them and had in their absence called them by name and asserted that they were the men who had shot and robbed him.   The evidence does not indicate that Welsh was unconscious to any degree that would affect the admissibility or credibility of his statements.   Although there was an indication of the approach of the lethargy which divides life from eternity, he was quick to recognize the good Samaritan who had given him a glass of water, and others, as well as the defendants, and his mind appears to have been clear.   It is unnecessary to review the other objections to this testimony, when it is admissible for the reasons stated.

3.   Exception on the ground that it was not *res gestæ* was taken to the testimony of Waldman that, after they had been thrown off the train and it had gone so that he could barely see the red lights and the end of the caboose, Welsh said: "For God's sake, Al., run and get help.   I am shot through the stomach."   If there be a doubt as to whether this was a part of the *res gestæ*, or properly admissible as a statement explaining Welsh's physical condition, and showing that he was aware of the fatal nature of his injuries, as an aid to the introduction of his dying declarations made later, the testimony would still be harmless as the hearsay statement of a fact, the wound through the stomach, which was shown by competent testimony without contradiction, and which counsel for defendant openly admitted on the trial.   It tended to prove nothing material which was not clearly established and frankly conceded.   It brought no doubtful matter to the attention of the jury to influence their verdict against the defendants.

4.   After Waldman had testified that after the robbery he went for assistance to Rye Patch, and there fell down, exhausted from the loss of blood, and knew nothing until the next morning, when he continued on to Oreana, objection was made, but there was no motion to strike out this testimony.   The same is true in regard to the answer by the witness that he had received a wound upon the head.   If it be conceded that this evidence was improper, and that the

court ought to have stricken out the answers, if a motion to that end had been made, still it does not appear to have been prejudicial to the defendants, in view of their admission upon the trial, that Welsh had been robbed and shot, and had died from the injuries he received, and of the fact that they rested upon an alibi and conceded that the deceased had been wounded, as claimed by the prosecution. The only question for the jury was whether the defendants were the perpetrators of a crime which was acknowledged to have been committed, and in view of this and all the circumstances the testimony did not have a tendency to influence the jurors on this issue.

5. The district court admitted the testimony of a witness named Townsend, who stated that money, including three Mexican coin pocket-pieces, had been taken from him by these men that night a few miles west of Zola siding, on east-bound freight train No. 220. These coins were found upon one of the defendants when they were searched in the jail in Lovelock the next morning. In this connection it is claimed, and authorities are cited in their brief holding, that it is not proper to show that the defendants have committed other crimes not connected with the one for which they are on trial. It will readily be seen that this correct legal principle does not apply to the circumstances in this case. This testimony was not introduced for the purpose of showing an independent robbery, and the fact that it had that tendency did not prevent its proper admission as one of the strongest and most material facts directly connecting the prisoners with the robbery and killing of Welsh. They claimed that they were in Lovelock all that night, and not on any train, and that it was too dark for them to be identified by the deceased and the witnesses, and consequently that the crime must have been committed by other persons unknown. It was the theory of the prosecution that the defendants had taken train No. 220, east-bound, from Lovelock, left it as it slowed at Zola siding, and returned on train No. 219. If they were upon No. 220, as the coins taken from Townsend thereon and found with them the next morning would indicate, they must have returned on No. 219, the train upon which

Welsh was robbed and shot, for the evidence indicates that they were back in Lovelock soon after its arrival, and before they could have reached there in any other way. The testimony was most material, direct, and important to show the presence of the defendants at the scene of the crime, and admissible, regardless of whether it indicated another offense, the robbery of Townsend. The court was particular to instruct the jury that they were not to consider the defendants guilty by reason of any crime not charged in the indictment. In *Hope* v. *People*, 83 N. Y. 418, 38 Am. Rep. 460, it was said: "But, where the evidence is relevant and material on the question of the guilt of the prisoner of the crime for which he is upon trial, it cannot be excluded merely because it also proves him guilty of another crime." In *State* v. *Kepper*, 65 Iowa, 745, 23 N. W. 304, evidence of a distinct offense was involved in proving the identity of the defendant, and in *Kernan* v. *State*, 65 Md. 253, 4 Atl. 124, evidence of the movements of the accused was held not incompetent because proof of another crime. Other cases, holding that evidence showing the defendant guilty of an offense not charged is not on that account inadmissible if it tends to prove any fact which is an element in the crime for which he is on trial, are *State* v. *Adams*, 20 Kan. 311; *McCartney* v. *State*, 3 Ind. 353, 56 Am. Dec. 510; *Swan* v. *Com.*, 104 Pa. 218, and many decisions cited in Abbott's Trial Brief (Crim.) p. 411, and pp. 514 to 523, covering numerous offenses. In *State* v. *McMahon*, 17 Nev. 365, 30 Pac. 1000, on a trial for arson, evidence of other fires was properly admitted to show that the one for which the defendant was indicted was not accidental. A number of the decisions cited by the appellants are in cases where proof of the presence of the accused at the place of the crime could have been given as fully and clearly without evidence of facts indicating another offense.

6. Of the four photographs offered on the trial, the one of the wound in the back after it had been opened by the knife of the surgeon was properly excluded by the court, because the bullet hole was no longer in the condition caused by the defendants. Of the three admitted, one shows the face of the deceased in the repose of death, and in it Conductor

La Point was able to recognize the features of the man that was picked up at the end of the ties near Zola in the morning and taken to Winnemucca in the caboose on his train, and the others showed the entrances of the bullets on the arm and leg, and were illustrative and instructive in connection with the testimony of the doctor and other witnesses. If their tendency was to give a more vivid realization of the wounds than a verbal description, they were less gruesome than an exhibition of the man's injuries to the jury in his real flesh and bone, which would have been permissible, if practicable. They had been taken the day after Welsh died, and were not especially repulsive, and there was testimony to their correctness. We are cited to some extreme cases where photographs were rejected on the grounds that witnesses had described what they would show, or that they would inflame and prejudice the jury—doctrines that we are not able to sanction, and which are not supported by the weight of authority. If juries cannot be intrusted with the pertinent facts for which litigants and offenders are responsible, however appalling they may be, and with the most accurate, instructive, and convincing evidence of those facts, it is time to abolish the jury system. Photography, engraving, and the art of picture-making are important factors in our civilization, and the courts in their search for truth should not be averse to accepting the benefits they bring. A glimpse at a photograph may give a more definite and correct idea of a building or of a person's features than the most minute and detailed testimony. A child may learn more regarding the appearance of an animal it never saw by the sight of its picture than by listening to a lecture or reading a volume of description. When photographs are shown to be correct representations, and give a better and clearer understanding of relevant facts, it would seem on reason and principle that their use as evidence should be favored. It is generally held that they need not be taken by a professional photographer, and that any one who knows may testify regarding their correctness. That photographs of proven fidelity are properly received for the purpose of identification, for illustrating testimony and for giving a better impression of persons, places

and things, and for more clearly showing material facts, has often been determined, as appears by the numerous cases cited in respondent's brief, and at section 792 of Wigmore's elaborate work on Evidence, at pages 414 to 419 of 17 Cyc., at page 513 of Abbott's Criminal Trial Brief, and in *Dede-richs* v. *Salt Lake City R. R. Co.*, 14 Utah, 137, 46 Pac. 656, 35 L. R. A. 802.

Photographs of deceased persons were properly admitted in *Wilson* v. *U. S.*, 162 U. S. 613, 16 Sup. Ct. 895, 40 L. Ed. 1090 (murder); *Ruloff* v. *People*, 45 N. Y. 213 (of deceased burglars after their bodies had been in the water two days); *Com.* v. *Keller*, 191 Pa. 122, 43 Atl. 198; *State* v. *Windohl*, 95 Iowa, 470, 64 N. W. 420 (of deceased after he was shot); *Smith* v. *Territory*, 11 Okl. 669, 69 Pac. 805 (corpse and wounds); *People* v. *Fish*, 125 N. Y. 136, 26 N. E. 319 (head and neck showing wounds); *Marion* v. *State*, 20 Neb. 240, 29 N. W. 911, 57 Am. Rep. 825; *Lamb* v. *State* (Neb.) 95 N. W. 1050; *State* v. *Hossock*, 116 Iowa, 194, 89 N. W. 1077. And of features, in *Com.* v. *Morgan*, 159 Mass. 375, 34 N. E. 458; *State* v. *Ellwood*, 17 R. I. 763, 24 Atl. 782; *State* v. *McCoy*, 15 Utah, 136, 49 Pac. 420; *People* v. *Durrant*, 116 Cal. 179, 48 Pac. 75; *Beavers* v. *State*, 58 Ind. 535; *Taylor* v. *Warner*, 88 Tex. 642, 32 S. W. 868; *Com.* v. *Connors*, 156 Pa. 147, 27 Atl. 366; *Cowley* v. *People*, 83 N. Y. 477, 38 Am. Rep. 464; *State* v. *Holden*, 42 Minn. 354, 44 N. W. 123. And of wounds, in *Reddin* v. *Gates*, 52 Iowa, 213, 2 N. W. 1079 (taken three days after injury).

And in *Franklin* v. *State*, 69 Ga. 42, 47 Am. Rep. 748, Chief Justice Jackson said: "A photograph of the wound of the deceased was admitted as evidence over the objection of defendant. The throat of deceased was cut, the character of the wound was important to elucidate the issue, the man was killed and buried, and a description of the cut by witnesses must have been resorted to. We cannot conceive of a more impartial and truthful witness than the sun, as its light stamps and seals the similitude of the wound on the photograph put before the jury. It would be more accurate than the memory of witnesses, and, as the object of all evidence is to show the truth, why should not this dumb witness

show it? Usually the photograph is introduced to prove the identity of person, but why not to show the character of the wound? In either case it is evidence. It throws light on the issue. (1 Bish. Crim. Proc. 1097; Wharton's Crim. Ev. 544, and cases cited in both texts.)"

7. The defendant Sevener testified on his direct examination that he had served a term in the state prison at San Quentin, California, and had been released on July 20, 1903, one month previous to the commission of the crime with which he here stands charged. On cross-examination he admitted that he had been convicted and was known there under the name of Lawson. The court sustained an objection to the question: "What other pens have you been in, Mr. Sevener, besides the California San Quentin pen?" Exception is taken to the allowance of the next question: "Ever arrested for any other offense, except the one in California?" To this he answered that he had been arrested in Vallejo "for being drunk with a bunch of shipmates." The district attorney replied: "If that is a misdemeanor, I do not care anything about it. I want to ask you if you were ever convicted of a felony, except the one which you served for—a penitentiary offense, not a county jail offense. I do not care anything about those." The objection to the question did not specify the ground that the witness could be interrogated only as to whether he had been convicted of felonies, and, if it had, we must presume that the court would have sustained the objection, and that the district attorney would have modified the question so as to limit it to convictions of felony, regarding which he evidently was seeking information. If the answer that he had been arrested for being drunk was harmful, which is not likely, under the disclaimer of the district attorney and the voluntary statement of the witness that he had served for a felony, and the defendant did not want it to stand, he ought to have moved to strike it out for the reason that it did not show conviction of a felony, the ground which he had failed to specify in his objection to the question. The common-law rule, which prohibits any one from testifying who has been convicted of an infamous crime, was in force in this state prior to 1881. (*State* v. *Foley*,

15 Nev. 73, 37 Am. Rep. 458.)   Since that year section 377 of
our civil practice act (Comp. Laws, 3472) has provided that
no person shall be disqualified as a witness "by reason of
his conviction of felony, but such conviction may be shown
for the purpose of affecting his credibility." (*State* v. *Ell-
wood*, 17 R. I. 763, 24 Atl. 782.)   Section 12 of the act
relating to crimes and punishments (Comp. Laws, 4667)
makes the rules for determining the competency of witnesses
in civil proceedings applicable to criminal actions.

8.   It is claimed that the evidence does not warrant the con-
viction of the defendant Roberts.   The written statement of
the dying man, made in the forenoon, that the shorter one
shot him, was corroborated by his identification in the after-
noon, when he singled Roberts out of more than a dozen
strangers, looked him in the eye, and said:   "You shot me."
Although Townsend did not see him, a brakeman saw him
and three others on train No. 220 a short time before it
reached Zola, and there is testimony that he was in Love-
lock that evening.   On the stand he stated that he was in
Lovelock all that night with the other defendants.   When
cross-examined regarding his whereabouts between 11 and
12 o'clock that night, he said they were around different
saloons in Lovelock during that hour, and not on any train.
If so, it is probable that he and the other defendants could
have clearly established an alibi.   Waldman testifies that he,
as well as the others, had his face partly covered by a cloth
around his chin.   Waldman did not see him shoot Welsh;
but, if he shot after Welsh fell to the ground, as declared in
the dying statement, Waldman had already fallen from the
train a half or quarter of a mile away, and it was not neces-
sary for him to have taken an active part at the time of the
robbery.   The testimony that Roberts was in Lovelock in the
evening, and was on train 220, and was not seen on train 219
until he appeared there with the other defendants, indicates
that he left and returned to Lovelock with them, which could
have been done in less than one hour.   It is apparent that
the evidence was quite sufficient to justify the jury in finding
that he was one of the conspirators and participants in this
midnight expedition of robbery and assassination.

The cause was carefully tried by court and counsel, the rights of the accused were well guarded, and the record shows no error prejudicial to them.

The judgment and order are affirmed, and the district court will fix a time for having its sentence carried into effect, and make the proper order for the execution of its judgment of death.